**WASHINGTON UTILITIES & TRANS-
PORTATION COMMISSION,
Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,**

Data Transmission Co. et al.,
Intervenors.

**NATIONAL ASSOCIATION OF REGU-
LATORY UTILITY COMMISSION-
ERS, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.**

Nos. 71–2919, 72–1198.

United States Court of Appeals,
Ninth Circuit.

Jan. 20, 1975.

---

**9.** *See* Hill v. Long Island R. R. Co., 257 F.2d 736, 737 (2 Cir. 1958); 6A Moore's Federal Practice, §§ 59.05(3), 59–67.

James R. Cunningham, Asst. Atty. Gen., Olympia, Wash., for Washington Utilities and Transp. Comm'n (argued), for petitioner in No. 71–2919.

Paul Rodgers, Gen. Counsel, (argued), Ray M. Druley, Asst. Gen. Counsel, (argued), Kenneth E. Hardman, Asst. Gen. Counsel, Washington, D. C., for National Assn. of Regulatory Utility Commissioners, for petitioner in No. 72–1198.

Charles M. Firestone, Counsel, F.C.C. (argued), Washington, D. C., Joel Davidow, Atty. Dept. of Justice (argued), for respondents.

Michael L. Glaser (argued), of Glaser & Fletcher, Washington, D. C., for Data Transmission.

William H. Borghesani, Jr. (argued), for Nat. Retail Merchants Assn., Washington, D. C., for applicants in intervention.

Thormund A. Miller, Gen. Counsel, Southern Pacific Communications, San Francisco, Cal. (argued), for Southern Pacific Communications Co.

Michael H. Bader (argued), of Haley, Bader & Potts, Washington, D. C., for MCI Carriers.

Before BROWNING, WRIGHT and WALLACE, Circuit Judges.

## OPINION

BROWNING, Circuit Judge:

The Federal Communications Commission authorized Microwave Communications, Inc., to construct a specialized communications common carrier route between St. Louis and Chicago. Microwave Communications, Inc., 18 F.C.C.2d 953 (1969). As a result, a large number of applications were filed by others interested in providing specialized communications services in competition with the established carriers.[1] The applications raised common questions. The Commission instituted a proceeding to formulate policy and establish rules with respect to these issues. *See* Notice of Inquiry to Formulate Policy, Notice of Proposed Rulemaking, and Order, 24 F.C.C.2d 318 (1970). These petitions seek review of the final order issued as a result of that proceeding. First Report and Order, 29 F.C.C.2d 870 (1971).[2]

The Commission's order reflects two basic determinations. The Commission decided that "a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity." 29 F.C.C.2d at 920. It also decided that "it is not necessary or desirable in the public interest to hold comparative hearings for the purpose of restricting new entry in any particular

area to only one private line applicant." 29 F.C.C.2d at 926.

Petitioners attack both determinations on substantive and procedural grounds resting upon the Federal Communications Act, 47 U.S.C. §§ 214, 309. They also argue that the Commission failed to consider the environmental impact of the policy adopted by the order as required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.

Respondents respond on the merits, and, in addition, challenge petitioners' standing to seek review of the Commission's order.

We hold that petitioners have standing. We affirm the order.

### I

We have been admonished that "[g]eneralizations about standing to sue are largely worthless as such" (Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)), and that the solution to standing "problems is in any event more or less determined by the specific circumstances of individual situations." United States ex rel. Chapman v. Federal Power Commission, 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953). From an examination of the nature of this proceeding, the character and interest of the parties, and the substance of the issues, we conclude that each petitioner is a "proper party to request an adjudication of [the] particular issue[s]" it seeks to raise. Flast v. Cohen, 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). *See also* United States v. Richardson, 418 U.S. 166, 174, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974); Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Petitioners seek review of final administrative action. The availability of judicial review of administrative decisions is generally thought to serve important

---

1. As of March 15, 1971, 33 applicants had submitted 46 separate proposals for the operation of 1877 microwave stations. First Report & Order, 29 F.C.C.2d 870, 871 n. 1 (1971).

2. The Commission's Memorandum Opinion and Order denying petitions for reconsideration is reported at 31 F.C.C.2d 1106 (1971).

public purposes.[3] This premise underlies the rule that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review" (Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)), and has led to a progressive expansion of the categories of persons who are granted standing to obtain such review. *See, e. g.*, Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations, Inc. v. Camp, *supra.*

Congress has expressly authorized review of final orders of the FCC.[4] Thus, "Congress has weighed the need for and value of judicial review of a given category of administrative decisions, and has decided it is warranted. Congress having explicitly made that decision, the Court has before it only the implementing, secondary decision as to whether there is reason not to allow the particular plaintiff in question to be one of those who may invoke the review—and the standing rules tend to become more liberal." Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv. L.Rev. 645, 656 (1973).

## A.

The Washington Utilities and Transportation Commission (WUTC) is an agency of the State of Washington, charged by law with responsibilities related to issues it seeks to raise. There is substantial authority that such an agency, raising such issues, is a proper plaintiff to obtain review of an administrative order.

WUTC's petition for review alleges that WUTC and the general public of Washington "are aggrieved" by the FCC order because "[e]ffectuation of the Order would serve to increase the burden to intrastate telephone users by reason of the diversion of interstate usage of telephone network facilities to the detriment of telephone users whose rates are regulated by state authorities."

■ The factual and legal premises for WUTC's assertion of standing are largely conceded. The telephone system is a single, integrated network. The same services and equipment provide both interstate and intrastate services. The rates fixed for these services must be sufficient to allow the utility to recover its expenses and receive a reasonable return on its investment. Since the rates of interstate services are fixed by the federal agency and rates for intrastate services by state agencies, common plant and service costs must be allocated between them. Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 146–149, 51 S.Ct. 65, 75 L.Ed. 255 (1930); The Minnesota Rate Cases, 230 U.S. 352, 435, 33 S.Ct. 729, 57 L.Ed. 1511 (1913). The allocation reflects the relative use of the common facilities in providing one service or the other. A reduction in interstate service relative to intrastate service would decrease the allocation of the costs of common plant and services to the base for interstate rates, and increase the allocation of these costs to the base for intrastate rates, thus requiring

---

**3.** *See, e. g.*, Tucker, The Metamorphosis of the Standing to Sue Doctrine, 17 N.Y.L.Forum 911, 935–40 (1972).

**4.** "The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1).

"Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 19A of Title 5." 47 U.S.C. § 402(a).

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

"Any party aggrieved by [a final order reviewable under 47 U.S.C. § 402(a)] may, within 60 days after its entry, file a petition to review the order in the court of appeals where venue lies." 28 U.S.C. § 2344.

state regulatory agencies to increase rates for intrastate service.[5]

WUTC contends that by authorizing new carriers to furnish specialized interstate communication services without determining that present carriers are unable to meet the need for this service, ·and without individualized determination of economic exclusivity, the Commission's order will result in an increase in the number of carriers competing to provide this interstate service and will decrease the usage existing carriers will make of common telephone facilities for the purpose of providing interstate service. This in turn will require allocation to intrastate service of a larger share of the costs of service and equipment used in providing both intrastate and interstate services, and will compel WUTC to raise rates for intrastate service, contrary to the interests of Washington telephone users.

WUTC is invested by statute with broad responsibilities to protect the interests of the people of the State of Washington in matters related to the cost and quality of telephone service. WUTC is required to "[r]egulate in the public interest . . . the rates, services, facilities, and practices of all persons [including telephone companies] engaging within this state in the business of supplying any utility service . . . to the public for compensation . . .." R.C.W. 80.01.040(3). The interest of the public to be protected under the statute is that of the customers of the regulated utility. Cole v. Washington Utilities & Transportation Commission, 79 Wash.2d 302, 306, 485 P.2d 71, 73–74 (1971). WUTC is empowered to fix rates for intrastate telephone service that are "just and reasonable" in order to protect consumers from charges that are "unjust, unreasonable, unjustly discriminatory or unduly preferential," as well as to protect the utilities from charges that are "insufficient to yield reasonable compensation for the service rendered." R.C.W. 80.36.140.

The Supreme Court of Washington has specifically recognized that WUTC has an obligation to protect the interests ·of telephone users in separations matters— analogous to those underlying WUTC's petition for review in this case—that come within its intrastate regulatory jurisdiction. In State ex rel. Pacific Northwest Bell Telephone Co. v. Washington Utilities & Transportation Commission, 66 Wash.2d 411, 403 P.2d 73 (1965), WUTC, under authority granted by R.C.W. 80.36.160, issued an order relating to the division of revenues derived from the interchange of interstate long distance telephone messages between Pacific Northwest Bell and two independent telephone companies. The determination of the appropriate division of revenues in turn required WUTC to devise a plan for the separation or allocation of costs among the various local and toll telephone services performed by the independent companies. In its opinion affirming the order, the court stated:

> The present proceeding is preliminary to the Commission's principal function, which is to establish rates for telephone service which are found to be fair, just, and reasonable to the user, and sufficient to provide reasonable compensation to the utility for the service rendered. See RCW 80.36.080 and 140.

> The Commission, in its order, pointed out that the division of revenues is inextricably related to the rate-making process. Thus the real parties in interest in this case are all the users of telephone service in the state of Washington who will have to pay the rates ultimately established for such service.

66 Wash.2d at 427, 403 P.2d at 84.

In addition to these regulatory functions, two other Washington statutes impose upon WUTC an advocacy role in support of the interests—stated in the

---

5. As stated in a recent Senate Report discussing telephone rates, "The determination of the rate base at the Federal level, then, has a strong relation to the rates which are charged at the local level." S.Rep.No. 362, 92d Cong., 1st Sess. (1971), 2 U.S.Code Cong. & Admin. News, pp. 1511, 1513.

broadest terms—of telephone users of the state. WUTC is authorized to participate in administrative and judicial proceedings of the kind involved here, "in which there is at issue the authority, rates or practices for . . . utility services affecting the interests of the state of Washington, its businesses and general public . . .." R.C.W. 80.01.-075.[6] WUTC's authority under this statute does not appear to be limited to proceedings relating to intrastate services; it exists whenever the authority, rate, or practice affects the interests of the state, its businesses, or its people. A second Washington statute gives WUTC power to investigate interstate rates and charges for telephone services, and provides, "[w]here any acts in relation thereto take place within this state which, in the opinion of the commission, are excessive or discriminatory, or are levied or laid in violation of the federal communications act . . .," WUTC can petition the FCC for relief. R.C.W. 80.36.250.

For thirty years or more WUTC and other state utilities commissions have acted on the premise that their duty to protect the interest of the people of their respective states is not discharged simply by accepting the existing allocation of joint costs to intrastate use as a base for determining reasonable intrastate rates. They have actively sought to reduce the allocation of joint costs to the intrastate rate base to the extent consistent with law. Congress and the FCC have long recognized that the state utilities commissions are the appropriate parties to represent their respective states in this effort.[7]

■ The test currently applied to determine if a private person has standing to seek judicial review of agency action is set forth in Association of Data Processing Service Organizations, Inc. v. Camp, *supra*, 397 U.S. at 152–153, 90 S.Ct. at 829: The complainant must allege "that the challenged action has caused him injury in fact, economic or

---

6. The statute reads:

The commission shall have the authority as petitioner, intervenor or otherwise to initiate and/or participate in proceedings before federal administrative agencies in which there is at issue the authority, rates or practices for transportation or utility services affecting the interests of the state of Washington, its businesses and general public, and to do all things necessary in its opinion to present to such federal administrative agencies all facts bearing upon such issues, and to similarly initiate and/or participate in any judicial proceedings relating thereto.

7. In 1941 the FCC and the National Association of Regulatory Utility Commissioners (NARUC) initiated a cooperative study of procedures for the allocation of joint costs. American Tel. & Tel. Co. and the Associated Bell System Companies, 3 F.C.C.2d 307, 309 (1960). In 1947 the FCC published the NARUC–FCC Separations Manual based on this study. *Id.* at 310. The FCC observed in its 1969 report: "Separations procedures that have been developed through the cooperative efforts of the Commission, the State regulatory agencies through the NARUC, and the telephone industry have long been used by telephone regulatory agencies for ratemaking purposes." 35th Annual Report of the FCC 60 (1969).

In 1969 the FCC ordered a $237 million reduction in interstate rates; at the same time rate increases of $500 million were pending before state regulatory agencies. 117 Cong. Rec. 28906–07 (1971). The reduction in interstate rates was based on the development of new technology, such as microwave transmission and coaxial cables, capable of application primarily in interstate communication. *Id.* at 28907 (remarks of Rep. Rooney). The FCC and NARUC cooperated, through a joint board administratively established by the FCC at NARUC's request, in recommending proposed rule changes for jurisdictional separations which, when adopted, resulted in a shift of $126 million in revenue requirements from intrastate to interstate operations. H.R. Rep.No. 429, 92d Cong., 1st Sess. 3 (1971). Congress was fully advised of these developments. The FCC and NARUC then agreed upon legislation for the establishment of a permanent Federal-State Joint Board to deal with separation problems. S.Rep.No. 92–362, 2 U.S.Code Cong. & Admin.News, 92d Cong., 1st Sess. pp. 1511, 1513–1514 (1971). In enacting the proposed statute Congress recognized, with approval, that the result of allowing representatives of the state commissions to participate would be an increase in the allocation of joint plant and operation costs to interstate use. 117 Cong.Rec. 28906–07.

otherwise," and the interest which the complainant seeks to protect must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Both parts of the *Data Processing* test are satisfied in this case.[8]

The purposes of the first *Data Processing* requirement—"injury in fact"— are satisfied here because the alleged interference with WUTC's ability to discharge its obligation to protect the interests of Washington telephone users gives specificity and concreteness to the controversy and assures its presentation with adversarial vigor.

■ The fact that WUTC's alleged injury is not economic in nature and cannot be quantified does not prevent it from satisfying the requirement of "injury in fact." *Data Processing, supra*, 397 U.S. at 154, 90 S.Ct. 827; Sierra Club v. Morton, *supra*, 405 U.S. at 734, 92 S.Ct. 1361; United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). WUTC's allegation that the FCC order will affect the discharge by WUTC of its duty to protect the interest of Washington telephone users arises too plausibly from the known facts of the industry to be dismissed as "an ingenious academic exercise in the conceivable." United States v. SCRAP, *supra*, 412 U.S. at 688, 93 S.Ct. at 2416.[9] And it is no bar to WUTC's standing that the line of causation between the FCC order and interference with WUTC's performance of its duties may be attenuated. *Id.* at 688–690, 93 S.Ct. 2405.

The obligation interfered with is imposed directly and specifically upon WUTC by statute. Thus, WUTC seeks to discharge a legal duty—it does not act from a generalized "motivation," Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 225–226, 94 S.Ct. 2925, 2934, 41 L.Ed.2d 706 (1974), or because of a "mere 'interest in a problem,'" Sierra Club v. Morton, *supra*, 405 U.S. at 739, 92 S.Ct. 1361; and its concern is not of a kind shared by citizens generally. Schlesinger v. Reservists Committee to Stop the War, *supra*, 418 U.S. at 216–217, 94 S.Ct. 2925, 2930; United States v. Richardson, *supra*, 418 U.S. at 176–179, 94 S.Ct. 2940, 2946–2947. As Judge Leventhal said in a similar context, "We should not be niggardly in gauging the interest of a state administrative officer in the validity of what his federal counterpart has done in an area of overlapping fact and intertwined law." Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694, 700 (1967).

In Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), the Supreme Court strongly suggested, in a somewhat different context, that for purposes of standing, impairment of an administrative agency's interest in the effective discharge of the obligations imposed upon the agency by law is the equivalent of the "personal stake," "injury in fact," or "concrete injury" that would support standing of a private plaintiff. The immediate question in Coleman v. Miller was whether state senators opposing ratification of the Child Labor Amendment had standing to seek review by the Supreme Court of a state court decision sustaining the right of the lieutenant governor to cast a decisive vote in favor of ratification. The Supreme Court held that the senators'

8. The Supreme Court has applied this two-part test in cases where there was no specific statutory provision for judicial review, and complainants relied on the general review provisions of the Administrative Procedure Act. Since in this instance the statute specifically provides for review, a less strict test for standing may be justified. *See* Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645, 667–68 (1973).

9. The FCC found there is "no reason to anticipate that new entry in the specialized field would result in any substantial diversion of A.T.&T.'s revenues or would have any significant adverse impact on telephone users" (29 F.C.C.2d at 912), but this finding cannot be conclusive on the issue of standing—one of the issues WUTC seeks to raise on review is that this finding is not sustained by the record. *See* United States v. SCRAP, 412 U.S. 669, 688–690, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Association of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 153, 158, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

interest in maintaining the effectiveness of their votes was sufficient to support standing. The Court noted, "[T]here has been recognition of the legitimate interest of public officials and administrative commissions, federal and state, to resist the endeavor to prevent the enforcement of statutes in relation to which they have official duties." 307 U.S. at 441–442, 59 S.Ct. at 977. Reviewing certain of its past decisions, the Court concluded (*id.* at 445, 59 S.Ct. at 978):

This class of cases in which we have exercised our appellate jurisdiction on the application of state officers may be said to recognize that they have an adequate interest in the controversy by reason of their duty to enforce the state statutes the validity of which has been drawn in question. In none of these cases could it be said that the state officers invoking our jurisdiction were sustaining any "private damage."

United States ex rel. Chapman v. Federal Power Commission, *supra*, 345 U.S. at 153, 73 S.Ct. 609, also holds, though without discussion, that an adverse effect on the performance of official duties constitutes the kind of injury necessary to support standing to sue. The Secretary of the Interior was permitted to challenge an FPC order granting a license to a private company to build a generating plant on a site that the Secretary argued had been withdrawn from the licensing jurisdiction of the FPC and reserved for public construction. The Court set out the bases relied upon by the Secretary for standing as follows (345 U.S. at 155–156, 73 S.Ct. at 612):

The Secretary of the Interior points to his statutory duty to act as sole marketing agent of power developed at public hydroelectric projects and not required for the operation of the project; § 5 of the Flood Control Act of 1944 directs him to transmit and dispose of such power in a manner calculated to "encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." 58 Stat. 890, 16 U.S.C. § 825s, 16 U.S.C.A. §

825s. This provision, it is said, announces a congressional policy for the guidance of the Secretary that would be disturbed by the respondent company's plan; thus a specific interest of the Secretary, in addition to his more general duties relating to the conservation and utilization of the Nation's water resources, is said to be adversely affected by the Commission's order.

Because of "[d]ifferences of view" among the Justices, 345 U.S. at 156, 73 S.Ct. 609, the grounds for the holding that the Secretary had standing to seek review of the FPC order were not discussed. However, since the Secretary alleged no private injury of any kind, his standing necessarily rested upon the adverse effect of the FTC order on performance of his official duties to encourage widespread use of electricity at the lowest possible rates, and, more generally, to manage the nation's water resources.

The Supreme Court held in Interstate Commerce Commission v. Oregon-Washington Railroad & Navigation Co., 288 U.S. 14, 24–25, 53 S.Ct. 266, 268, 77 L.Ed. 588 (1933), that state agencies had standing to challenge a district court order reversing an ICC order requiring construction of several railroad routes, because the agencies "officially represent[ed] the interest of their states in obtaining adequate transportation service." In a different context, the Court held in Securities & Exchange Commission v. United States Realty & Improvement Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940), that the SEC should be permitted to intervene in a Chapter XI proceeding that the Commission alleged should have been brought under Chapter X, which provides for participation by the Commission. The Court said, "we think it [is] plain that the Commission has a sufficient interest in the maintenance of its statutory authority and the performance of its public duties to entitle it through intervention to prevent reorganizations which should rightly be subjected to its scrutiny, from proceeding without it." 310 U.S. at 460, 60 S.Ct. at 1055.

In this circuit the principle that a public agency has standing to seek judicial review of governmental action that affects the performance of its duties has been explicitly recognized by a three-judge court in a case involving WUTC's predecessor agency, the Department of Public Works of the State of Washington. In Department of Public Works v. United States, 55 F.2d 392 (W.D. Wash.1932), the department was held to have standing to obtain judicial review of an order of the Interstate Commerce Commission. The order provided that rates for transporting grain from points south of the Snake River in Washington and Oregon to Portland, Oregon, must be 10 per cent lower than the rates for shipment of grain from the same area to ports on Puget Sound, Washington. The effect of the order was to prescribe an intrastate rate that would otherwise have been subject to the jurisdiction of the state agency. The court held (55 F.2d at 394):

> . . . the laws of the United States having made provision for suits to set aside unauthorized orders of the Intrastate Commerce Commission, it would be unreasonable to deny to the petitioner the right to bring a suit such as the present in order that it may, in a proper case, remove obstacles to the exercise of its statutory powers. As long as the order of the Interstate Commerce Commission remains in effect, it is an obstacle hindering, if not preventing, the exercise by the department of its powers under section 10389.[10]

On the basis of these and other cases in which state and federal officials and agencies have been allowed to challenge a wide range of administrative orders affecting the discharge by the officer or agency of obligations imposed by law,[11] and because the purposes of the "injury in fact" requirement are adequately served, we conclude that the adverse effect of the FCC's order on WUTC's exercise of its statutory duties satisfies this element of the *Data Processing* test for standing.

The second requirement of *Data Processing* is also satisfied: The interest WUTC seeks to protect—reasonable intrastate telephone rates and, more generally, high quality and widely available intrastate telephone service—is "arguably within the zone of interests to be protected" by the Federal Communications Act. The statutory standard governing the licensing of communications carriers is the "public convenience and necessity," 47 U.S.C. § 214(a), and the touchstone of decision in applying this standard is "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. The Commission's broad mandate would not permit it to ignore the impact of its orders upon the quality and cost of local telephone service which constitutes the vast bulk of the total telephone service used by the people of the United States.[12] This is obviously the Commission's view, for it gave specific consideration to that impact in the present proceeding. See 31 F.C.C.2d at 1107–08.

Permitting a public agency charged with relevant legal obligations to obtain

---

**10.** Section 10389 is the predecessor of R.C.W. 81.28.230, which is identical to R.C.W. 80.36.-140, *see* p. 1147 *supra*, except that the former governs transportation of persons and property and the latter the transmission of messages by telegraph or telephone.

**11.** *See also* Board of Educ. v. Allen, 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Akron Bd. of Educ. v. State Bd. of Educ., 490 F.2d 1285 (6th Cir. 1974); Brewer v. Hoxie School Dist., 238 F.2d 91, 104 (8th Cir. 1956).

**12.** Approximately 169 billion calls were transmitted in 1969. Of these, almost 160 billion were local calls regulated by state commissions. 36 FCC Annual Reports, Table at 255 (1970). Of the approximately 9.5 billion toll calls, a substantial number were intrastate and therefore also subject to state regulation. The FCC exercises jurisdiction over approximately 25% of A.T.&T.'s plant. State commissions exercise jurisdiction over the remaining 75% and over virtually all of the plant of the independent (non-Bell) telephone companies. Re American Tel. & Tel. Co., 70 P.U.R.3d 129, 145, ¶ 21 (1967).

judicial review of a final order of a regulatory agency specifically declared reviewable by Congress, on the ground that the order has an adverse impact on the complainant agency's performance of its statutory obligations, presents no potential whatever for abuse of the judicial process or distortion of the role of the Judicial branch of government in its relationship to the Executive and the Legislative branches—concerns that may have some substance where private litigants assert standing as taxpayers or citizens to initiate plenary actions challenging the constitutionality of federal statutes or of the conduct of executive departments. *See, e. g.,* Schlesinger v. Reservists to Stop the War, *supra;* United States v. Richardson, *supra.* Indeed, allowing such agencies standing may often be the only practical means of effectuating Congress' declaration that judicial review of particular federal agency action is appropriate. In the present case, for example, although judicial review of the Commission's order is expressly provided for, any adverse impact of the FCC order on intrastate telephone rates would probably be so indirect, and take place so gradually, that individual users of intrastate telephone service would be unaware of it, or, in any case, would have inadequate incentive to incur the expense of judicial review. *See* Akron Board of Education v. State Board of Education, 490 F.2d 1285, 1289–1290 (6th Cir. 1974).

We therefore hold that WUTC has standing in its own right to secure judicial review of this FCC order.

WUTC may also obtain review of the challenged FCC action as *parens patriae.*[13] A substantial portion of Washington's citizens would be affected by an increase in intrastate telephone rates. *Cf.* Kansas v. Colorado, 206 U.S. 46, 99, 27 S.Ct. 655, 51 L.Ed. 956 (1907). Petitions for review by individual users are not a practicable remedy. *See* Missouri v. Illinois, 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497 (1901). The state has an interest independent of its individual citizens, for increased rates for intrastate telephone service would inhibit communication vital to the economic and social well-being of the community as a whole. *See* Georgia v. Pennsylvania Railroad, 324 U.S. 439, 450–451, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); Pennsylvania v. West Virginia, 262 U.S. 553, 592, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 (1907); California v. Frito-Lay, Inc., 474 F.2d 774, 775 (9th Cir. 1973). The fact that communications rates are closely regulated by both the United States and the various states reflects the presence of a governmental interest above and beyond the concerns of the individual citizen.[14] Finally, none of the considerations that have justified restrictions upon the power of the state to represent the interest of its citizenry *parens patriae* are present here. The original jurisdiction

13. States or territories have been permitted to sue as *parens patriae* for review of federal regulatory agency decisions in many cases. *E. g.,* Guam v. Federal Maritime Comm'n, 117 U.S.App.D.C. 296, 329 F.2d 251, 252–253 & n. 7 (1964); California v. FPC, 111 U.S.App.D.C. 226, 296 F.2d 348 (1961), rev'd on other grounds, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); Puerto Rico v. Federal Maritime Bd., 110 U.S.App.D.C. 17, 288 F.2d 419 (1961); New York v. United States, 65 F.Supp. 856, 872 (N.D.N.Y.1946), aff'd, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). *See also* Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), aff'g Wisconsin v. FPC, 92 U.S.App. D.C. 284, 205 F.2d 706 (1953) (standing apparently based on *parens patriae,* though

standing issue not discussed); Public Utilities Comm'n v. FPC, 205 F.2d 116, 119 (3d Cir. 1953) (assuming standing without deciding).

WUTC's authority to initiate these judicial proceedings on behalf of the people of the State of Washington is found in R.C.W. 80.-01.075. *See* note 6.

14. At least where injunctive relief is sought, the grounds separately listed here may be alternative. An independent state interest may be sufficient, whether or not a substantial portion of the citizenry is affected or an adequate individual remedy is available. Note, Federal Jurisdiction—Suits by a State as *Parens Patriae,* 48 N.C.L.Rev. 963, 969 (1970).

of the Supreme Court is not invoked, and the availability of a remedy need not be restricted by the necessity of husbanding that court's limited resources. Since no state is sued, there is no threat of circumvention of the Eleventh Amendment. *See, e. g.,* Hawaii v. Standard Oil Co., 405 U.S. 251, 258 n. 12, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Oklahoma ex rel. Johnson v. Cook, 304 U.S. 387, 392–393, 58 S.Ct. 954, 82 L.Ed. 1416 (1938).[15] Since no damages are sought, there is no risk of duplicating recoveries. Hawaii v. Standard Oil Co., *supra,* 405 U.S. at 261–264, 92 S.Ct. 885. Since no absent persons will be barred from a remedy otherwise available if this petition is entertained, the proceeding is not subject to criticism as a substitute for a class action without its safeguards. California v. Frito-Lay, Inc., *supra,* 474 F.2d at 777 n. 11.

The argument is made that WUTC is barred from maintaining a *parens patriae* challenge to an order of an agency of the federal government by the holding of Massachusetts v. Mellon, 262 U.S. 447, 485–486, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), that "[w]hile the State, under some circumstances, may sue [as *parens patriae*] for the protection of its citizens (Missouri v. Illinois and Chicago District, 180 U.S. 208, 241, 21 S.Ct. 331, 45 L.Ed. 497), it is no part of its duty or power to enforce their rights in respect of their relations with the federal government.

In that field it is the United States, and not the state, which represents them as *parens patriae* . . .."

The doctrine of Massachusetts v. Mellon is not applicable to this proceeding. Massachusetts had alleged that a federal statute was unconstitutional as a usurpation by Congress of power reserved to the states. As the Court pointed out in Georgia v. Pennsylvania Railroad, *supra,* Massachusetts sought to litigate a "question of distribution of powers between the State and the national government" (324 U.S. at 445, 65 S.Ct. at 720), and "protect her citizens from the operation of federal statutes" (*id.* at 447, 65 S.Ct. at 721). There are no such questions here. WUTC does not attack the constitutionality of the Communications Act on any ground; rather, it relies upon the federal statute, and seeks to vindicate the congressional will by preventing what it asserts to be a violation of that statute by the administrative agency charged with its enforcement. That federal agency is not the only public body that may invoke judicial assistance to enforce the Act. *See* Georgia v. Pennsylvania Railroad, *supra,* 324 U.S. at 447, 65 S.Ct. at 721 ("The fact that the United States may bring criminal prosecutions or suits for injunctions under [the antitrust] laws does not mean that [a state] may not maintain [a *parens patriae* suit]").[16]

15. "Today the policy underlying the eleventh amendment appears to be the principal limitation on the state's attempt to assert the interests of its citizens as *parens patriae.*" Comment, The Original Jurisdiction of the United States Supreme Court, 11 Stan.L.Rev. 665, 674 (1959).

16. The Georgia v. Pennsylvania R.R. majority rejected the broad principle stated by Justice Stone in dissent that "[t]he federal government alone stands in such relationship to the citizens and inhabitants of the United States, as to permit the bringing of suit in their behalf, to protect them from the violation of federal laws relating to interstate commerce." 324 U.S. at 474, 65 S.Ct. at 734. *See also* Note, Federal Jurisdiction—Suits by a State as *Parens Patriae,* 48 N.C.L.Rev. 963, 966–67 (1970).

In Minnesota v. Benson, 107 U.S.App.D.C. 106, 274 F.2d 764 (1960), this theory was invoked to deny Minnesota the right as *parens patriae* to obtain judicial review of an order of the Secretary of Agriculture. But in Guam v. Federal Maritime Comm'n, 117 U.S. App.D.C. 296, 329 F.2d 251, 252 (1964), *Benson* was limited to review of "an action of the federal government *itself, i. e.,* a milk regulation." The court held in *Guam* that "in utility cases involving private operators a state or municipal government may be a proper party and, if adversely affected as such by an order, is aggrieved," and may obtain judicial review. *Id.,* 329 F.2d at 253.

In a footnote in Public Utilities Comm'n v. United States, 356 F.2d 236, 241 n. 1 (9th Cir. 1966), Judge Madden queried whether *Mellon* barred review of an FCC order on petition of the California commission, but concluded that

B.

██ We turn to the standing of the National Association of Regulatory Utility Commissioners (NARUC). A substantial argument can be made that NARUC has standing in its own right,[17] but we need not reach that question. NARUC describes itself as a "quasi-governmental nonprofit organization" composed of "the governmental bodies of the fifty States engaged in the regulation of utilities and carriers,"[18] including WUTC. Since WUTC and other public agencies alleged to have similar duties are members of NARUC, and since WUTC and similar agencies have standing to sue,[19] NARUC's right to judicial review is estab-

---

it was not necessary to answer the question in that case.

The authority of *Mellon*, at least as a broad rather than a narrow proposition, may have been "eroded by time." Massachusetts v. Laird, 400 U.S. 886, 889, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970) (Douglas, J., dissenting from denial of leave to file bill of complaint). Indeed, the Supreme Court has allowed a state to challenge as *parens patriae* an allegedly unconstitutional congressional statute. South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). This action has been taken by several commentators as casting doubt on the *Mellon* proposition. C. Wright, Law of Federal Courts 503 (1970); Bickel, The Voting Rights Cases, 1966 Sup.Ct.Rev. 79, 87–89. It would be improvident to extend a doctrine that is of questionable authority in its original application.

17. NARUC is not merely a "concerned bystander" seeking "vindication of value interests." United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Congress has accorded NARUC official status as the representative of state regulatory agencies in dealing with the basic problem underlying these petitions for review.

A brief statement of the joint efforts of the FCC and NARUC in the area of allocating common carrier property and expenses between interstate and intrastate operations, as the base for determining telephone rates, is found in footnote 7. *See also* S.Rep.No. 92–362, 92d Cong., 1st Sess. (1971), 2 U.S.Code Cong. & Admin.News, pp. 1511, 1513–1514, accompanying H.R. 7048 enacted as P.L. 92–131, amending 47 U.S.C. § 410.

The latter amendment provides for the creation of a Federal-State Joint Board to consider proceedings "regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations." 47 U.S.C. § 410(c). The statute further provides, "The Joint Board shall be composed of three Commissioners of the [Federal Communications] Commission and of four State commissioners nominated by the national organization of the State commissions, as referred to in section 302(b) and 305(f) of Title 49, and approved by the Commission." *Id.* The "national organization" referred to is NARUC. *See* H.R.Rep.No. 253, 89th Cong.,

1st Sess. (1965), 2 U.S.Code Cong. & Admin. News, pp. 2923, 2928.

The order sought to be reviewed in this case is not directly concerned with the "separations" problem. However, the petitioners allege that the order will have an effect in this area that will impair the performance of obligations that, in the case of WUTC, are officially imposed, and, in the case of NARUC, are officially sanctioned.

Although NARUC is not compelled by statute to discharge these obligations, it assumed them with the acquiescence, encouragement, and solicitation of the Congress and the Commission. As Judge Leventhal has said, "Interest groups are, in today's complex society, an indispensable part of an effective channel of communication between government and the persons whose conduct the government seeks to affect." National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 694 (1971). "[W]hether or not this begins as a duty, it is a necessity, and gives rise to relationships that cannot be ignored by the courts." *Id.* At least where the relationship is as nearly official and as relevant to the subject matter to be litigated as it is in this instance with respect to NARUC, the purposes of the standing requirement are satisfied for essentially the same reasons as they are with respect to WUTC.

18. NARUC's petition for review states:

The NARUC is a quasi-governmental nonprofit organization founded in 1889. Within its membership are the governmental bodies of the fifty States engaged in the regulation of utilities and carriers. The mission of the NARUC is to improve the quality and effectiveness of public regulation in America. More specifically, the NARUC contains the State officials charged with the duty of regulating communication common carriers within their respective States and, as such, they have the obligation to assure the establishment and maintenance of such communications service and facilities as may be required by the public convenience and necessity, and the furnishing of service at rates that are just and reasonable.

19. NARUC's petition for review specifically alleged injury to its member state commissions.

lished upon this ground alone. Sierra Club v. Morton, *supra*, 405 U.S. at 739, 92 S.Ct. 1361; National Association for the Advancement of Colored People v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).[20]

## II

On the merits, the issue most strongly pressed is that the Commission violated both substantive and procedural requirements of the Federal Communications Act in determining that a general policy in favor of entry of new carriers in the specialized communications field would serve the public interest. NARUC's principal argument is that under the "public interest, convenience, and necessity" standard of the Act, 47 U.S.C. §§ 214, 309, the Commission cannot approve new common carriers unless existing common carriers could not provide the service, and such a finding has not been, and could not be, made. WUTC emphasizes the procedural objection, arguing that under the provisions of the Act, 47 U.S.C. §§ 309, 316, an evidentiary hearing must be held on each pending application to decide whether the competition proposed by that application would further the public interest, and that a policy and rulemaking proceeding will not suffice.

### A.

The business involved is that of providing specialized private or leased line communication services through microwave transmission facilities, as distinguished from public exchange and long distance toll telephone service. The latter consists primarily of voice communication service from and to all points on an integrated national and international telephone network, available to the public generally. The proposed service consists of communication of all types of signals, including data and other non-voice traffic, but only to or from limited points, and only pursuant to private con-

tract. The applicants propose to offer users a wide range of choice as to cost, speed, and quality of transmission, part-or full-time availability, shared or exclusive usage, and utilization of the customer's own terminal equipment.

The Commission had earlier authorized private companies to build and operate their own microwave facilities to meet such specialized needs, upon a showing of financial and technical qualifications. Allocation of Microwave Frequencies above 890 Mc., 27 F.C.C. 359 (1959), 29 F.C.C. 825 (1960).

The Commission's Notice of the present proceeding stated the first issue to be "Whether as a general policy the public interest would be served by permitting the entry of new carriers . . . ." 24 F.C.C.2d 318, 327 (1970). The legal and factual bases upon which the Commission's staff recommended an affirmative answer were set out in detail in the Notice, and comments were solicited. *Id.* at 328–38. Over 200 interested persons responded, all but a few favoring the proposed policy. First Report and Order, 29 F.C.C.2d 870, 879 (1971). The Commission heard oral argument and received rebuttal comments. It then filed its report and order, concluding, among other things, that "a general policy in favor of the entry of new carriers in the specialized communications field would serve the public interest, convenience, and necessity." *Id.* at 920.

The Commission based its conclusion upon the following general findings: "[T]here is a public need and demand for the proposed facilities and services and for new and diverse sources of supply, competition in the specialized communications field is reasonably feasible, there are grounds for a reasonable expectation that new entry will have some beneficial effects, and there is no reason to anticipate that new entry would have any adverse impact on service to the public by

**20.** Since NARUC has standing to raise the Federal Communications Act issues, it may also challenge the order for noncompliance with the National Environmental Protection

Act, as it has sought to do. Sierra Club v. Morton, 405 U.S. 727, 737, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

existing carriers such as to outweigh the consideration supporting new entry." *Id.* These findings are based in turn upon subsidiary factual determinations, forecasts, and expert judgments detailed in the Commission's report. *Id.* at 904–20. These are briefly outlined in the margin.[21]

21. Use of microwave frequencies in the transmission of communications is a post-World War II development, capable of a wide range of specialized applications. The need for all communications services is growing rapidly. Existing carriers (principally A.T.&T. and Western Union) have not met the increasing and widespread need for diverse and flexible specialized communications services, particularly in the transmission of data. Market studies and independent forecasts establish that there is a very large undeveloped market for such services. Although there is some overlap, the services proposed by applicants are significantly different from those offered by established carriers. The applicants seek primarily to develop new services and markets, and to tap latent, undeveloped submarkets for existing service. The applicants offer service features designed to meet the special and diverse technical and service requirements of specialized users, achieving the economies and benefits of specialization. It is reasonable to conclude that the effect of new entry will be expansion of the total communications market. Competition within the market for specialized services should motivate innovation, and produce even greater growth rates.

The existing carriers' facilities and practices have been developed primarily to meet the needs of voice transmission. Major modifications may be required to meet the different needs for efficient data transmission. Moreover, the capability of established carriers to meet future requirements should not be determinative where growing future traffic is concerned and new services are proposed. Even if existing carriers might furnish the prospective services, other benefits are reasonably to be anticipated from new entry in the specialized communications field. New entry will provide flexibility and wider choice in satisfying expanding and changing requirements in this field.

It is questionable whether existing carriers can meet the new requirements in the specialized communications field and still meet the increasing requirements of the public monopoly services, particularly in view of the diversity of such requirements, the designing and engineering problems involved, and the huge and increasing amounts of new capital required. Entry of new carriers would disperse the burdens, risks, and initiatives involved.

Competition in specialized communications would enlarge the equipment market for manufacturers other than Western Electric, and thus stimulate innovation. New carriers could devote their undivided attention to particular needs, and would be under pressure to innovate.

New carriers would provide a useful regulatory tool, furnishing a standard for comparison among specialized communications carriers, and encouraging beneficial changes in A.T.&T.'s services and charges.

New entry in the specialized field would not adversely affect the furnishing of services to the public by existing carriers. The specialized communications services involved constitute only a very small percentage of A.T.&T.'s total market. The market for standard voice communications services is not affected; it accounts for the bulk of A.T.&T.'s revenue, and it is also expanding with great rapidity. A.T.&T. will also be free to compete in the new field and is likely to obtain a very substantial portion of the potential market for specialized services. The potential impact on Western Union is greater, since a larger percentage of its service will be vulnerable to the new competition. However, a recently approved merger (In Re Western Union Tel. Co., 24 F.C.C.2d 664 (1970)) will add substantially to Western Union's revenue. Moreover, the market involved is new, relatively untouched, and growing at a very rapid rate, and Western Union may retain most of its present specialized business as well as capture a sizeable share of the potential market. The independent telephone companies do not furnish intercity facilities, and to the extent the new entrants rely on existing local distribution facilities the business of independent telephone companies will increase.

The "cream skimming" charge is unfounded primarily because applicants propose to serve special service markets that have not yet been developed, and because they propose to serve all such markets, excluding none that has a significant need.

The contention that allowing new entry will sacrifice potential economies of size is rejected because the potential for such economies is not great in the specialized communications field in view of rapidly changing applications of improved technology and growing potential markets made up of diverse consumer demands. Attempts to adapt A.T.&T.'s voice communication facilities to data communication may leave users of both types of service unsatisfied and vitiate any economies of each. Any such economies that might be realized are overbalanced by the benefits that can be expected from the participation of smaller, specialized carriers.

The Commission's subsidiary findings weaken NARUC's factual premise that existing carriers might have been able to furnish the proposed services. Nonetheless, the Commission clearly rejected NARUC's legal premise that the existence of such a capability would require rejection of applications from new carriers, and the merits of NARUC's contention must therefore be considered.

NARUC asserts that Congress, in enacting the Communications Act of 1934 and the amendments thereto, "clearly intended that the Commission would regulate common carriers as quasi-monopolies and that new entrants would only be authorized when existing carriers [could] not provide adequate service." For this proposition NARUC relies principally upon an historical review tracing the origin of sections 201–222 of Title II of the Communications Act to the Interstate Commerce Act, and upon decisions relating to the regulation of transportation common carriers.[22]

■ NARUC interprets the Communications Act too narrowly. As the Commission points out, "[t]he statutory standard governing the Commission's consideration of applications for microwave radio facilities to provide common carrier services is broadly stated in Sections 309 and 214 of the Communications Act: whether a grant would serve the present or future public interest, convenience, and necessity." 29 F.C.C.2d at 901. As the Commission further notes, and as we noted in Part I of this opinion, this broad standard is to be interpreted in light of the Commission's sweeping mandate to regulate "interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communications service with adequate facilities at reasonable charges . . . ." (47 U.S.C. § 151), and "generally encourage the larger and more effective use of radio in the public interest" (47 U.S.C. § 303(g)). See 29 F.C. C.2d at 901.

This statutory language does not suggest that the Commission is to give controlling weight to the mere fact that existing common carriers have the ability to perform the service an applicant wishes to furnish. Nor, for that matter, does it suggest that the Commission is to accord controlling weight to asserted benefits of competition, or to any other particular factor. The Commission's authority is stated broadly to avoid the need for repeated congressional review and revision of the Commission's authority to meet the needs of a dynamic, rapidly changing industry. National Association of Theatre Owners v. Federal Communications Commission, 136 U.S.App. D.C. 352, 420 F.2d 194, 199 (1969). Regulatory practices and policies that will serve the "public interest" today may be quite different from those that were adequate to that purpose in 1910, 1927, or 1934, or that may further the public interest in the future.[23]

---

**22.** *E. g.,* American Trucking Ass'n v. United States, 326 U.S. 77, 86, 65 S.Ct. 1499, 89 L.Ed. 2065 (1945); McLean Trucking Co. v. United States, 321 U.S. 67, 83, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Transit Comm'n v. United States, 289 U.S. 121, 125–126, 53 S.Ct. 536, 77 L.Ed. 1075 (1933); Texas & New Orleans R.R. v. Northside Belt Ry., 276 U.S. 475, 479, 48 S.Ct. 361, 72 L.Ed. 661 (1928). *See also* Delta Airlines v. CAB, 143 U.S.App.D.C. 8, 442 F.2d 730, 733 (1970); Delta Airlines v. CAB, 107 U.S.App.D.C. 174, 275 F.2d 632, 637–638 (1959). NARUC also refers to language suggesting that traditional telephone and telegraph companies, because they were considered to be natural monopolies, were intended to be regulated with a presumption against competition, much as rail-

roads had been. FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 869 (1940); National Ass'n of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 420 F.2d 194, 203 (1969). *See also* Hawaiian Tel. Co. v. FCC, 498 F.2d 771 (D.C.Cir.1974). For a specific rejection of the view that the public convenience and necessity standard of § 214 of the Communications Act is to be interpreted generally in the same manner as § 1(18) of the Interstate Commerce Act, *see* General Tel. Co. v. United States, 449 F.2d 846, 856 (5th Cir. 1971).

**23.** Cases cited by the Commission (29 F.C. C.2d at 901) sustain its interpretation of §§ 4(i) and (j) and 303(r) of the Communications Act, 47 U.S.C. §§ 154(i) and (j), 303(r), as

The power of the Commission, in determining the "public interest," to accord competitive considerations the weight the Commission gave to them in this case is fully supported by the Supreme Court's opinion in Federal Communications Commission v. RCA Communications Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953).[24] The Court held that the Commission could not treat the encouragement of competition as such as "the single or controlling reliance for safeguarding the public interest," (*id.* 346 U.S. at 93, 73 S.Ct. at 1003), and therefore could not authorize entry of a competing carrier on the naked assumption that as a matter of national policy, competition was to be fostered if "reasonably feasible" (*id.* at 95, 73 S.Ct. at 998). Because the Commission had authorized a new radio telegraph service on just that premise, the case was remanded for reconsideration. The Court made it clear, however, that "competition is a relevant factor in weighing the public interest," and if the Commission had "clearly indicated that it relied on its own evaluation of the needs of the industry rather than on what it deemed a national policy, its order would have a different foundation." *Id.* at 94, 73 S.Ct. at 1004. The Court spelled out the basis upon which the Commission could authorize new entry because of competitive considerations (*id.* at 96–97, 73 S.Ct. at 1004–1005):

> We think it not inadmissible for the Commission, when it makes manifest that in so doing it is conscientiously exercising the discretion given it by Congress, to reach a conclusion whereby authorizations would be granted wherever competition is reasonably feasible. This is so precisely because

the exercise of its functions gives it accumulating insight not vouchsafed to courts dealing episodically with the practical problems involved in such determination. Here, however, the conclusion was not based on the Commission's own judgment but rather on the unjustified assumption that it was Congress' judgment that such authorizations are desirable. . . .

In reaching a conclusion that duplicating authorizations are in the public interest wherever competition is reasonably feasible, the Commission is not required to make specific findings of tangible benefit. It is not required to grant authorizations only if there is a demonstration of facts indicating immediate benefit to the public. To restrict the Commission's action to cases in which tangible evidence appropriate for judicial determination is available would disregard a major reason for the creation of administrative agencies, better equipped as they are for weighing intangibles "by specialization, by insight gained through experience, and by more flexible procedure." Far East Conference v. United States, 342 U.S. 570, 575 [72 S.Ct. 492, 494, 90 L.Ed. 576]. In the nature of things, the possible benefits of competition do not lend themselves to detailed forecast, cf. National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 348 [73 S.Ct. 287, 289 (97 L.Ed. 377)], but the Commission must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it. Although we think RCAC's contention that an applicant must demonstrate tangible benefits is asking too much, it is not too much to ask that there be ground

conferring "'not niggardly but expansive powers' and wide discretion to adopt flexible procedures, rules and orders to meet ever-changing communications needs. . . . National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344; FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 137–138, 60 S.Ct. 437, 87 L.Ed. 656; United States v. Southwestern Cable Co., 392 U.S. 157, 172–173; United States v. Storer Broadcasting Co., 351 U.S. 192, 202–203, 76 S.Ct. 763, 100 L.Ed. 1081."

24. General Tel. Co. v. United States, 449 F.2d 846, 857–58 (5th Cir. 1971). *See also* Gulf States Util. Co. v. FPC, 411 U.S. 747, 759, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); City of Huntingburg v. FPC, 498 F.2d 778, 783–84 (D.C.Cir.1974).

for reasonable expectation that competition may have some beneficial effect. Merely to assume that competition is bound to be of advantage, in an industry so regulated and so largely closed as is this one, is not enough.

We have quoted the Court at length because it is evident from the Commission's opinion in the present case that the Commission was fully conscious of the guidelines announced in *RCA Communications,* and sought conscientiously to follow them. Our earlier summary of the Commission's opinion demonstrates that the Commission succeeded. *See* note 21 *supra.* The Commission's policy determination that the public interest would be served by entry of new carriers in the specialized communications field is based upon its own judgment that such authorizations are desirable, a judgment reached in a conscientious exercise of the discretion vested in the Commission by Congress. As to the benefits of competition, the Commission said, "It is our judgment, based on our cumulative knowledge of the industry and the entire record in this proceeding—including our staff's analysis, that there is a sufficient ground for a reasonable expectation that new entry here will have some beneficial effects. We so warrant." 29 F.C.C.2d at 910. Against their benefits, the Commission carefully weighed possible adverse effects of competition upon existing carriers and their services (29 F.C. C.2d at 910–14) before finally concluding that a general policy of new entry would serve the public interest, convenience, and necessity.

The Supreme Court's disposition of *RCA Communications* is flatly inconsistent with NARUC's contention that new entry is impermissible if it will result in duplication of facilities of existing carriers capable of furnishing the service. The Supreme Court noted that the Commission had found that more facilities were then authorized than were neces-

sary to handle the present and expected volume of traffic under sound operating conditions. 346 U.S. at 88, 73 S.Ct. 998.[25] Nonetheless, the Court remanded with the express understanding that the Commission might permit entry of new carriers if it found the public interest would be served.

The disposition on remand is significant. As the Commission notes (29 F.C. C.2d at 902 n. 19):

On remand in that case the Commission concluded on the basis of its experience that competition resulting from a grant of the application was reasonably feasible and would serve the public interest. It stated: "What we require is that, in order to be successful an applicant must demonstrate that, as has been done here, through the operation of such a circuit, some public need would be served or some advantage would accrue to the public, or at least that there is a reasonable expectation that such competition may have some beneficial effect." Mackey Radio and Telegraph Company, Inc., 19 FCC 1321, 1350 (1955), aff'd RCA Communications, Inc. v. FCC, 99 U.S.App.D.C. 163, 238 F.2d 24, 27–28 (1956), cert. den. 352 U.S. 1004, 77 S.Ct. 563, 1 L.Ed.2d 549 (1957).

As the Commission puts it, *RCA Communications* stands for the proposition that "while wasteful duplication is generally to be avoided, duplication is not wasteful where a certificating agency appropriately concludes that competition is reasonably feasible and may be expected to have some beneficial effect." 29 F.C.C.2d at 902 n. 20.

■ Assuming that the use of rulemaking procedures in this case was appropriate, we are not persuaded by NARUC's attacks upon the sufficiency of the record in support of the rule adopted. We are satisfied that "there is sufficient relationship between the Commis-

**25.** This finding prompted Justice Douglas to dissent from the Court's ultimate disposition of the case, arguing that remand would be fruitless because the Commission, exercising its independent judgment, could not possibly find that the entry of new carriers would serve the public interest. 346 U.S. at 99, 73 S.Ct. 998.

sion's conclusion and the factual bases in the record upon which it relied to substantively support this exercise of its authority." United States v. Allegheny-Ludlum Steel Co., 406 U.S. 742, 755–56, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453 (1972).[26]

Not surprisingly, both NARUC and WUTC place some emphasis upon the contention that the Commission did not give sufficient consideration to the risk that new specialized carriers would divert interstate business from the established carriers, leading to higher rates for local users. It is argued that the Commission did not sufficiently investigate the nature and size of the market or the potential economic impact of new entrants. The Commission specifically addressed itself to these contentions. 29 F.C.C.2d at 910–14, 917–20; 31 F.C.C.2d at 1107–08. Its response is adequate.

■ There is truth in NARUC's charge that the Commission's decision rests in good part upon "supposititious eventualities." Planning necessarily rests upon the acceptance of uncertain forecasts of future events. No other course is possible if the Commission is to formulate regulatory practices and policies that will enable the industry to satisfy future public needs.[27]

### B.

We turn now to WUTC's argument that it was improper for the Commission to employ policy- and rulemaking procedures to determine whether competition would further the public interest rather than determining this issue in adjudicative hearings on individual applications.

At the outset, it is clear that if it was permissible for the Commission to adopt a general and nationwide policy that the public interest would be served by permitting the entry of new carriers in the specialized communications field, it was appropriate for the Commission to do so in a rulemaking proceeding. The policy proposed and adopted by the Commission falls precisely within the Administrative Procedure Act's definition of a "rule."[28] The problem confronting the Commission met uniformly accepted standards for utilization of rulemaking procedures: It affected large numbers of individual situations, it involved determination of a general policy applicable equally to all in the affected class, case-by-case adjudication would require repetitious determination of precisely the same issue, it concerned future events, and it required a broad judgment, legislative in nature, rather than resolution of a particular dispute of fact.[29]

---

**26.** The Court explained this standard of review as follows:

> We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported.

406 U.S. at 749, 92 S.Ct. at 1946. Prior to this decision, there was disagreement among lower courts as to the standard of review of agency rules such as those involved in *Allegheny-Ludlum Steel Corp.* and in this case. *Compare* California Citizens Band Ass'n v. United States, 375 F.2d 43, 53–54 (9th Cir. 1967) and Superior Oil Co. v. FPC, 322 F.2d 601, 619 (9th Cir. 1963) *with* City of Chicago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731, 741–745 (1972).

**27.** FCC v. RCA Communications, Inc., 346 U.S. 86, 96–97, 73 S.Ct. 998, 97 L.Ed. 1470

(1953); United States v. Detroit & Cleveland Nav. Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945); GTE Serv. Corp. v. FCC, 474 F.2d 724, 731 (2d Cir. 1973); *see* American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624, 633 (1966).

**28.** A "rule" is defined as "[t]he whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).

**29.** "It must be emphasized that here the Commission is moving into a new area of policy affecting large numbers of telephone carriers. The advantages of rule-making over adjudicatory proceedings in such circumstances are well understood." GTE Serv. Corp. v. FCC, 474 F.2d 724, 732 (2d Cir. 1973). "Adjudicatory hearings serve an important function when the agency bases its decision on the peculiar situation of individual parties who

■■■ The crucial question is whether the Commission acted within its statutory authority in adopting a general policy favoring entry of new carriers rather than considering the costs and benefits of the specific proposal in each application. We hold that the Commission did act within its authority.

WUTC contends that 47 U.S.C. §§ 214 and 309, particularly the latter, bar formulation of a policy determination in rulemaking proceedings that the public interest would be served by the entry of new carriers. As WUTC points out, section 309(a) provides that "the Commission shall determine, in the case of each application filed with it . . . whether the public interest, convenience, and necessity will be served by the granting of such application"; and sections 309(d)(2) and 309(e) mandate an adjudicatory hearing, conducted in accordance with 5 U.S.C. § 556(d), if "a substantial and material issue of fact is presented."

The Commission points out that it did act upon the merits of individual applications: "[T]his proceeding does not undertake to decide all of the issues pertinent to pending applications, and does not go to the qualifications of the applicants or the sufficiency of particular proposals. Such questions will be resolved by appro-

priate procedures when the applications are processed [under § 309]." *See* 29 F.C.C.2d at 896. WUTC responds that by adopting a policy in favor of competitive entry the Commission decided the substance of the issue of public interest, convenience, and necessity as to each of the pending applications, leaving open only whether the particular applicant is qualified and the proposed service is technically and economically sound. WUTC asserts that the adequacy of existing service, the need for the new service, and the desirability of competitive entry must also be determined in adjudicatory proceedings upon each application pursuant to section 309.

The same argument has been advanced repeatedly both under the statutory provisions involved here and analogous statutes, and has been repeatedly rejected.

Sections 4(i), 4(j) and 303(r) of the Act, 47 U.S.C. §§ 154(i) & (j), 303(r), describe the Commission's broad power to issue rules and regulations.[30] Section 309 defines the Commission's authority in granting or denying an individual application. WUTC's "contentions sharply pose the issue whether provisions for general rule making by administrative agencies are to be applied in their apparent breadth or are limited by other stat-

know more about this than anyone else. But when, as here, a new policy is based upon the general characteristics of an industry, rational decision is not furthered by requiring the agency to lose itself in an excursion into detail that too often obscures fundamental issues rather than clarifies them." WBEN, Inc. v. United States, 396 F.2d 601, 618 (2d Cir. 1968). "The adversary nature of [a trial-type] proceeding is particularly suited to the determination of 'adjudicative' facts, but not to the development of 'legislative' facts—that is, to determine specific events in the past which are contested rather than general information upon which policy decisions are based." Note, The Judicial Role in Defining Procedural Requirements for Agency Rulemaking, 87 Harv.L.Rev. 782, 784 (1974). *See also* United States v. Florida East Coast Ry., 410 U.S. 224, 245–246, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); FPC v. Texaco, Inc., 377 U.S. 33, 44, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); SEC v. Chenery Corp., 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); City of Chi-

cago v. FPC, 147 U.S.App.D.C. 312, 458 F.2d 731, 739 (1971); General Tel. Co. v. United States, 449 F.2d 846, 863 n. 15 (5th Cir. 1971); Airline Pilots Ass'n v. Quesada, 276 F.2d 892, 895–896 (2d Cir. 1960).

**30.** 47 U.S.C. § 154(i) provides:

The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

47 U.S.C. § 154(j) provides in part:

The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. . . .

47 U.S.C. § 303(r) authorizes the Commission to:

Make . . . such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . . .

utory provisions seemingly framed to deal with the different problem \of individual applications. In resolving the conflict it is well to remember that Congress could hardly have intended to deprive administrative agencies of the ability to administer." WBEN, Inc. v. United States, 396 F.2d 601, 617 (2d Cir. 1968).

As the concluding admonition foretells, *WBEN, Inc.* resolved the conflict in favor of the Commission's broad rulemaking power. Acting under section 303(r) of the Act, the Commission in that case had promulgated a new rule limiting the predawn broadcasting rights of a class of broadcasters. The latter contended that a separate evidentiary hearing as to each licensee was required by section 316(a) of the Act which permits modification of a station license or permit only if the Commission determines "such action will promote the public interest, convenience, and necessity," and requires that the holder be given an opportunity to show cause "by public hearing" why the modification should not issue. The court held (396 F.2d at 618):

> But no case cited to us has held that § 316 thus disables the agency in the exercise of its rule-making powers. Rather, in the only decision in point, the Ninth Circuit upheld the Commission's modification of existing license rights by rule, declaring that § 316's "primary function is to protect the individual licensee from a modification order of the Commission and is concerned with the conduct and other facts peculiar to an individual licensee." California Citizens Band Association v. United States, 375 F.2d 43 (1967), cert. denied, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967). The decision draws the proper line.

Another of the Commission's rules involved in *WBEN, Inc.* provided that an authorization to offer pre-sunrise broadcast service was to issue to eligible stations merely upon a showing as to technical matters. It was contended that this rule was precluded by the provisions of section 309(d) (the section relied upon by WUTC in this case) allowing any party in interest the right to file a petition to deny such an application, and requiring an evidentiary hearing to resolve any "substantial and material questions of fact." 396 F.2d at 621. The court held that the analysis of section 316 in relation to section 303(r) applied to section 309 as well. The court said (396 F.2d at 622):

> . . . § 309(d) was an attempt to provide a workable method whereby persons affected by an individual application for a license or its modification were to have notice and a reasonable period for registering their objections without, however, requiring the FCC to hold a hearing in every case where a petition to deny was filed. Nothing in the text or in the history indicates that the statute was addressed to the entirely different situation where, after proceeding under § 4 of the APA, the Commission utilizes the rule-making power granted by § 303(r) to alter the permissible times of operation by existing licensees, particularly since, as indicated above, compliance with § 309(d) after such a rule-making proceeding would generally be an exercise in futility.

The Supreme Court arrived at the same conclusion with respect to the relationship between the Commission's rule-making power under section 303(r) of the Act and its duty to adjudicate under section 309 in United States v. Storer Broadcasting Company, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). Following a rulemaking proceeding under the authority of section 303(r), the Commission issued rules providing that in passing upon applications for television broadcasting licenses it would consider it to be contrary to public interest, convenience, or necessity for any party to have an interest in more than five television stations. Storer Broadcasting Company had five such stations. On the day the rules were adopted, a pending application by Storer for an additional station was dismissed on the basis of the rule. Storer argued that by the express terms

of section 309 its application could not be rejected without a "full hearing." The Supreme Court held, however, that the Act must be read as a whole, that section 309 did not withdraw the Commission's rulemaking power under section 303(r), that in the exercise of that power the Commission could announce in advance its attitude regarding concentration of control as it related to the public interest, and that unless an application set forth reasons sufficient to justify a change or waiver of the rule, section 309 did not require a hearing. 351 U.S. at 202–205, 76 S.Ct. 763.

Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), applied the same analysis to comparable provisions of the Natural Gas Act. Following rulemaking proceedings the Commission issued regulations providing that a producer's application for a certificate of public interest, convenience, and necessity under section 7 of the Act would be rejected if any contract submitted in support of the application contained certain forbidden provisions. An application submitted by Texaco, Inc. was rejected under the rule without a hearing despite the provision of section 7 that the Commission "shall set" such applications "for hearing." The Court of Appeals set aside the Commission's order, holding that the regulation was a valid statement of Commission policy, but that it could not "be used to deprive an applicant of the statutory hearing granted those who seek certificates of public convenience and necessity." 377 U.S. at 37, 84 S.Ct. 1105, 1108. The Supreme Court reversed, holding, on the authority of *Storer,* "that the statutory requirement for a hearing under § 7 does not preclude the Commission from particularizing statutory standards through the rule-making process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived." *Id.* at 39, 84 S.Ct. at 1109.

The same principle was applied under similar statutory provisions in American Airlines, Inc. v. Civil Aeronautics Board,

123 U.S.App.D.C. 310, 359 F.2d 624, 628, 631 (1966), and Airline Pilots Association v. Quesada, 276 F.2d 892 (2d Cir. 1960).

In *American Airlines, Inc.* the Civil Aeronautics Board issued a policy statement after rulemaking proceedings that only all-cargo carriers could sell space for freight on a reserved basis at wholesale rates. The Board approved pending tariffs of all-cargo carriers providing for such service and summarily rejected the similar tariffs filed by combination carriers. The latter objected on the ground that the Board's action effected a modification of their certificates of public convenience and necessity which could be accomplished only after a full adjudicatory hearing under section 401(g) of the Federal Aviation Act, 49 U.S.C. § 1371(g). The court rejected the argument on the basis of the *Storer* rule "that notwithstanding the statutory hearing requirement the Commission retained the power to promulgate rules of general application consistent with the Act, and to deny an adjudicatory hearing to applicants whose applications on their face showed violations of the rule." 359 F.2d at 628. The court, in rejecting the suggestion that *Storer* applied only to regulations affecting future applications for new certificates, and not to regulations affecting rights under existing certificates, stated (359 F.2d at 629):

> [T]he *Storer* doctrine is not to be revised or reshaped by reference to fortuitous circumstances. It rests on a fundamental awareness that rule making is a vital part of the administrative process, particularly adapted to and needful for sound evolution of policy in guiding the future development of industries subject to intensive administrative regulation in the public interest, and that such rule making is not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making.

*Airline Pilots Association* sustained a regulation issued by the Federal Avia-

tion Agency after rulemaking proceedings that no person over 60 could serve as a commercial aircraft pilot. Plaintiffs argued that the regulation was invalid because it was issued without an adjudicatory hearing required by section 609 of the Federal Aviation Act of 1958, 49 U.S.C. § 1429, before an airman's license may be amended, modified, suspended, or revoked. The court rejected the argument, holding that section 1429 applied "only when an order of the Administrator is directed to an individual airman and is concerned with conduct or other facts peculiar to the airman," and was "not intended to apply when a general directive of the Administrator is promulgated [under § 601 of the Act, 49 U.S.C. § 1421] though the regulation may in fact modify airmen's certificates." 276 F.2d at 897.

WUTC distinguishes *Storer* on several grounds. It notes that the regulation involved in *Storer* set up standards that *barred* issuance of a certificate of public interest, convenience, and necessity to applicants who did not meet them, while in this case the standard *permitted* entry. The relevance of this difference is not apparent. The rules involved in *WBEN, Inc.* and *American Airlines* favored some grants and barred others. In either case the Commission uses rulemaking procedures to arrive at a general determination as to a matter relevant to the public interest, convenience, and necessity. To repeat, "the *Storer* doctrine is not to be revised or reshaped by reference to fortuitous circumstances." American Airlines, Inc. v. Civil Aeronautics Board, *supra,* 359 F.2d at 629.

 WUTC seems to argue that *Storer* should not be applied because the issue resolved by rulemaking in this case is somehow more central to the discharge of the Commission's ultimate statutory responsibility to determine the public interest, convenience, and necessity. The rule involved in *Storer,* as in each of the other cases discussed, effectively determined that a class of applications would be approved or rejected, and thus effectively determined the public

interest, convenience, and necessity as related to the disposition of each such application. These cases reject WUTC's assumption that adjudicatory proceedings are preferred if not mandated for the determination of issues central to the public interest. When, as here, the issue is resolved by adoption of a general policy for uniform application in the regulation of a nationwide industry, rulemaking is an entirely appropriate means for "a particularization of the Commission's conception of the 'public interest' sought to be safeguarded by Congress in enacting the Communications Act of 1934." National Broadcasting Co. v. United States, 319 U.S. 190, 218, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943).

WUTC contends that the Commission bound "itself inflexibly to the licensing policies expressed" in its order, contrary to the requirement of National Broadcasting Co. v. United States, *supra,* 319 U.S. at 225, 63 S.Ct. at 1013; *see* Federal Power Commission v. Texaco, Inc., *supra,* 377 U.S. at 40–41, 84 S.Ct. 1105; United States v. Storer Broadcasting Company, *supra,* 351 U.S. at 204–205, 76 S.Ct. 763. Though the Commission said it would pass separately upon the merits of each pending application, presumably the rule would govern individual cases. That is its function. *Cf.* Port Angeles Telecable, Inc. v. Federal Communications Commission, 416 F.2d 243, 246 n. 6 (9th Cir. 1969). Nonetheless, the Commission's regulations specifically provide for waiver of "rules, regulations or other requirements" upon an appropriate showing. 47 C.F.R. § 1.566 (1973); United States v. Storer Broadcasting Company, *supra,* 357 U.S. at 201, 205, 76 S.Ct. 763; *see also* 47 C.F.R. § 1.3 (1973); WBEN, Inc. v. United States, *supra,* 396 F.2d at 618. In addition, the Commission specifically noted (29 F.C.C.2d at 900 n. 17): "As in the case of any policy or rule of general applicability, a waiver, exception or evidentiary hearing may be granted upon an adequate showing of exceptional circumstances making it inappropriate to apply the policy or rule in a particular situation." Further, the Commission said it would "examine future applica-

tions in light of the circumstances then shown," and expressed its willingness to alter its policy "if it no longer comports with the public interest, convenience, and necessity" (29 F.C.C.2d at 927), an assurance the Commission has recently reaffirmed. *See* In re Commission Policies Governing the Licensing and Regulation of Specialized Common Carriers, 44 F.C.C.2d 467, 471 n. 2 (1973).

### III

Both NARUC and WUTC challenge the Commission's conclusion that "it is not necessary or desirable in the public interest to hold comparative hearings for the purpose of restricting new entry in any particular area to only one private line applicant." 29 F.C.C.2d at 926. Again, the petitioners' arguments rest on somewhat different grounds.

 NARUC's argument is not directed to comparative hearings as such; rather, under this heading, NARUC presents a general objection to the Commission's use of rulemaking procedures. Its argument is simply that section 309(e) requires an adjudicatory hearing when "a substantial and material question of fact is presented"; and that both the record in this proceeding and the several opinions filed in Microwave Communications Inc., 18 F.C.C.2d 953 (1969), demonstrate that many such questions were presented here, including the nature and extent of the market, the ability of existing carriers to supply it, whether the applicants proposed a different service than is now available, the cost of the proposed service, the extent of duplication of facilities involved, the potential for "cream skimming," and the effect upon existing carriers of this and other potential consequences of competition. The answer to this argument, as we have said, is that rulemaking pursuant to section 303(r) is an alternative to adjudicatory proceedings under section 309 in a proper case, and that this is such a case. Rulemaking is hardly limited, as NARUC implies, to that certainly rare and probably entirely hypothetical situation in which the facts relevant to determination of a question of general policy are beyond dispute.[31]

WUTC's argument is that the Commission must inquire whether the service proposed by any of the applicants would preclude the service proposed by any other; and, if it would, that the Commission must hold a comparative hearing to determine which applicant should be authorized to render the service. WUTC relies primarily upon what are commonly referred to as the *Ashbacker* doctrine and the *Carroll* doctrine, originating in Ashbacker Radio Corporation v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), and Carroll Broadcasting Co. v. Federal Communications Commission, 103 U.S. App.D.C. 346, 258 F.2d 440 (1958).

*Ashbacker* involved two applications for broadcasting authority that were actually exclusive in the sense that the broadcast signals would interfere with each other. Only one of the two applications could be granted. The Commission granted one and set the other for hearing. The Court held that as a practical

---

**31.** In United States v. Florida East Coast Ry., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), it was argued that because § 1(14)(a) of the Interstate Commerce Act required the Commission to give consideration to certain factors specified in the statute when it fixed the compensation to be paid by one railroad for the use of freight cars of another, the Commission was required to make its determination "on the record after opportunity for agency hearing" pursuant to 5 U.S.C. § 553(c), rather than by informal rulemaking procedures. The Court rejected the argument, stating (410 U.S. at 235, 93 S.Ct. at 816):

> We know of no reason to think that an administrative agency in reaching a decision cannot accord consideration to factors such as those set forth in the 1966 amendment by means other than a trial-type hearing or the presentation of oral argument by the affected parties. Congress by that amendment specified necessary components of the ultimate decision, but it did not specify the method by which the Commission should acquire information about those components.

matter this required the second applicant to justify displacement of an established licensee, and made the second applicant's right under section 309(a) to a hearing before denial an "empty thing." The Court held, "where two *bona fide* applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him." 326 U.S. at 333, 66 S.Ct. at 151. Mutual exclusivity in the *Ashbacker* sense is not involved in this case.

*Carroll* held that, in some circumstances, before an application for a license can be granted a section 309 hearing is required "to determine whether the economic effect of a second license in this area would be to damage or destroy service to an extent inconsistent with the public interest," 258 F.2d at 443. As the *Carroll* court plainly stated, the doctrine of that case is simply a particularization of the public interest standard: "The basic charter of the Commission is, of course, to act in the public interest. It grants or denies licenses as the public interest, convenience and necessity dictate. Whatever factual elements make up that criterion in any given problem—and the problem may differ factually from case to case—must be considered." *Id.* *Carroll* recognized that sometimes competition may serve the public interest; sometimes it may not. If in a proceeding under section 309 the Commission is presented with a substantial showing that it will not, appropriate findings should be made. *Id.,* 258 F.2d at

444. The showing required is described in WLVA, Inc. v. Federal Communications Commission, 148 U.S.App.D.C. 262, 459 F.2d 1286, 1297 (1972): "[A] petitioner seeking a hearing on the *Carroll* issue must plead specific factual data sufficient to make out a prima facie case that the economic consequences of a grant of the challenged application will lead to an overall derogation of service to the public."[32]

■ But once again, the Commission may determine general questions relating to the public interest, convenience, and necessity in rulemaking proceedings; and, specifically, may determine that competition in the furnishing of a class of regulated service will lead not to poorer but to better service to the public, and will otherwise be in the public interest. We have sustained the Commission's determination to this effect with respect to the specialized communications field as a whole, supporting a general policy favoring entry of new carriers nationwide. The Commission's determination with regard to comparative hearings is simply a reaffirmation of that general policy, as applied to the specific applications then pending.

■ The reasons given by the Commission in support of its conclusion that it would be contrary to the public interest and inconsistent with its policy determination in favor of new entry to limit entry among pending applications by holding comparative hearings on issues of economic exclusivity, are summarized in the margin.[33] They reflect a careful

---

32. The Court continued:

Specifically, the petitioner must raise substantial and material questions of fact as to whether: (1) the revenue potential of the market is such that a grant will cause the petitioner to suffer a significant loss of income; (2) the effect of this loss will be to compel the petitioner to eliminate some or all of its public service programming; and (3) this loss of programming will not be offset by the increased non-network programming proposed to be offered by the applicant.

33. As the Commission had concluded, the public interest would be served by offering

users flexibility and a wide range of choice. The applicants were seeking to develop a relatively new and potentially very large market with heterogeneous submarkets. The proposals reflected differing routes and services. The various systems might develop along different lines. The number of potentially successful operations might well depend on the ingenuity, enterprise, and initiative of the participants in developing new services and equipment. Only four of the 33 applicants claimed economic exclusivity, and they failed to make a substantial prima facie showing that the potential specialized market along any route was so limited as to support only a single entrant. The remaining applicants are

consideration of the relevant factors, and a reasoned exercise of the Commission's discretion.[34]

## IV

NARUC attacks the order on the additional ground that the Commission failed to consider the environmental impact of the policy adopted by the order, as required by section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332.

Neither NARUC nor any other party raised the NEPA claim before the Commission. The Commission argues that this court is barred from considering the claim by 47 U.S.C. § 405,[35] which "precludes judicial review of questions of law or fact that the Commission has not had an opportunity to pass upon." Neckritz v. Federal Communications Commission, 446 F.2d 501, 503 (9th Cir. 1971); see Great Falls Community TV Cable Co. v. Federal Communications Commission, 416 F.2d 238 (9th Cir. 1969).

NEPA does not permit the Commission to confine itself to consideration of environmental issues raised by the parties. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118–1119 (1971). The Commission is required "to consider environmental values 'at every distinctive and comprehensive stage of the [agency's] process.' The primary and nondelegable responsibility for fulfilling that function lies with the Commission." Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 420 (2d Cir. 1972), quoting Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, supra, 449 F.2d at 1119. The immediate question, however, is not whether the FCC failed to discharge its obligations under NEPA, but whether its alleged failure may be considered on review of the Commission's order. That question is still governed by section 405(a), for "NEPA was not intended to repeal by implication any other statute." United States v. SCRAP, supra, 412 U.S. at 694, 93 S.Ct. at 2419.

But "the doctrine expressed in section 405 is not inflexible; it leaves room for

---

willing to proceed in the face of competition. The Commission has found a general public need and demand for the proposed services in all areas. The record as a whole indicates that entry by more than one private line carrier should generally be reasonably feasible, in view of the large and heterogeneous potential market. The investment and revenue requirements are such that a comparatively small share of the potential market may result in a financially successful operation for any one applicant and that a number of small carriers may co-exist in any particular region. If some fail, the adverse consequences would not be significant. Merger is more likely than bankruptcy or removal of facilities from the field. Even if a carrier is lost, demand for this type of communication could be met by another entrant or by an established carrier, and the frequencies would revert to the Commission for reassignment to others. There would be minimal inconvenience to the public. If it should turn out that the market is spread so thin among the new entrants as to adversely affect their service to the public in an area, the Commission can take remedial action by rulemaking or comparative hearing at license renewal time. The Commission does not know whether all of the pending

applications will be found qualified and, if so, will elect to proceed. Since new entry of more than one private applicant appears reasonably feasible in the potential market, the market place is a more reliable and effective instrument than the comparative hearing process for determining how many and which new entrants may succeed. In summary, it is desirable to avoid delay in the institution of services needed by the public now, the public will be benefited by the availability of diverse options, and there will be no public detriment if some of the pending applicants fail.

34. The Commission responded briefly but adequately to WUTC's vigorously pressed argument that special consideration was required of applications to provide service in the Pacific Coast area. 29 F.C.C.2d at 899, 926–27.

35. 47 U.S.C. § 405 provides that "[t]he filing of a petition for rehearing shall not be a condition precedent to judicial review of any . . . order, decision, report, or action [by the Commission], except where the party seeking such review . . . (2) relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass."

the operation of sound judicial discretion to determine whether and to what extent judicial review of questions not raised before the agency should be denied." Great Falls Community TV Cable Co. v. Federal Communications Commission, *supra,* 416 F.2d at 239. A proper accommodation with NEPA requires that the appellate court in exercising its discretion under section 405 weigh the "lofty purposes" of NEPA (United States v. SCRAP, *supra,* 412 U.S. at 693, 93 S.Ct. 2405) heavily in the balance.[36]

Giving full weight to NEPA's vital purposes, we conclude that in the particular circumstances of this case the balance should be struck against possible review and reversal of this Commission order on the ground NARUC seeks to raise for the first time in this court. In reaching this conclusion, we do not mean to imply that an environmental impact statement would have been required had the issue been raised before the Commission.

Any damage that might be done to NEPA interests by failure to review the NEPA questions now is problematical and, in any event, slight. The FCC's order simply adopts policy. Before any construction is authorized, separate hearings must be held on each application. NEPA will be applicable to those proceedings. The FCC must consider "the

environmental impact of the proposed action" as a whole, and in full context. It cannot treat each application separately from the others and ignore the total program of which it is a part.[37] There is no apparent obstacle to NARUC presenting its position on the environmental issue to the Commission in a proceeding on one or more of the individual applications; and, if the Commission fails to apply the proper standard, NARUC may obtain judicial review.

It is also of some relevance to the balancing of interests that NARUC's claims of environmental impact do not appear to be particularly substantial. If the order had not been entered, the specialized communications services would have been furnished by the present common carriers, using facilities built for that purpose. These carriers insist that they alone could and would have supplied all future needs for these services. The effect of the order will be to introduce competition in the furnishing of the services. The immediate effect of the order is upon who will furnish the service, not whether it will be furnished, or how much; competition may or may not increase the total volume of service performed. At issue is the incremental adverse effect that might result from the substitution of competition for monopoly, and only the portion of this increment, if

---

**36.** The discretion exercised by the court under 47 U.S.C. § 405 is the same as that exercised in applying the general nonstatutory requirement of exhaustion of administrative remedies; for the doctrine "is substantially the same whether or not it happens to be embodied in such a statutory provision." K. Davis, Administrative Law Treatise § 20.06, at 92 (1958). *See also* McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The factors to be considered are spelled out in McGee v. United States, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971), and McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657 (1969). *See also* Craycroft v. Ferrall, 408 F.2d 587 (9th Cir. 1969).

City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972) (three judge court), does not hold that the general doctrine requiring exhaustion of administrative remedies is inapplicable to NEPA issues. In that

case the NEPA issues were presented to the agency during the administrative process.

**37.** *See* Natural Resources Defense Council v. Grant, 341 F.Supp. 356, 367 (E.D.N.C.1972). The Guidelines of the Council on Environmental Quality provide:

The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the *overall, cumulative* impact of the action proposed (and of further actions contemplated). Such actions may be localized in their impact, but if there is *potential* that the environment *may* be significantly affected, the statement is to be prepared. Proposed actions, the environmental impact of which is apt to be highly controversial, should be covered in all cases. 36 Fed.Reg. 7724 (1971) (emphasis supplied).

any, that cannot be adequately considered in individualized hearings.

Balanced against these problematical and attenuated adverse consequences of denying review, the disadvantages of allowing NARUC and others similarly situated to bypass the administrative proceeding are substantial. We are denied the benefit of the Commission's views on even the threshold question of whether and to what extent NEPA applies in the peculiar substantive and procedural posture of this matter. If the NEPA issue had been timely raised, it might have been fully explored by the Commission, and could now be finally resolved, on an adequate record, without further delay. Such a resolution cannot now be achieved without great delay, waste, and expense. The order under consideration is a first step in a continuing, interrelated, administrative process. It is important that challenges to such a process be raised and resolved in its earlier stages so that subsequent steps may be undertaken with a full appreciation of the risks. *Cf.* United States v. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952). Finally, we cannot ignore the potential for abuse if those who object to an agency's action, and would prefer to delay it if it cannot be wholly barred, are permitted to reserve an issue that might induce a remand if all else fails.

The order of the Commission is affirmed.

WALLACE, Circuit Judge (concurring):

I concur in the result reached by the majority. However, I disagree that standing for Washington Utilities & Transportation Commission (WUTC) should be based on the alternative ground of *parens patriae.* Not only is the *parens patriae* reasoning unnecessary to decide this case but application of the doctrine appears to be barred by Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). There Massa-

chusetts, acting as *parens patriae,* sued to prevent enforcement of the Maternity Act of 1921, alleging that it was an unconstitutional usurpation of state power. The Court stated:

We need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress; but we are clear that the right to do so does not arise here. . . . [T]he citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a state, as *parens patriae,* may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the state, under some circumstances, may sue in that capacity for the protection of its citizens (Missouri v. Illinois and Chicago District, 180 U.S. 208, 241 [21 S.Ct. 331, 45 L.Ed. 497]), it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae,* when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

*Id.* at 485–486, 43 S.Ct. at 600.

The Supreme Court has relied upon Massachusetts v. Mellon to deny Florida standing to act as *parens patriae* in an action to enjoin collection of federal inheritance taxes in Florida. Florida v. Mellon, 273 U.S. 12, 18, 47 S.Ct. 265, 71 L.Ed. 511 (1927). The Court has also denied standing to the Governor of Louisiana to bring an original action on behalf of the state to enjoin the enforcement of a regulation under the Emergency Price Control Act of 1942 fixing maximum prices for strawberries. Jones ex rel. Louisiana v. Bowles, 322 U.S. 707, 64 S.Ct. 1043, 88 L.Ed. 1551 (1944) (Per Curiam). *See* H. Hart and H. Wechsler, The Federal Courts and The Federal System 276 (2d ed. 1973).

The holding of Massachusetts v. Mellon has not been, as the majority contends, "eroded by time." This phrase is from the dissenting opinion of Justice Douglas in Massachusetts v. Laird, 400 U.S. 886, 889, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970), a case in which Massachusetts sought to adjudicate the constitutionality of the participation of the United States in the Vietnam war. The majority, however, denied the state leave to file a complaint either because it lacked standing or because it did not present a justiciable controversy. *See id.* at 887, 91 S.Ct. 128 (Douglas, J., dissenting). Furthermore, the Solicitor General had argued that Massachusetts v. Mellon barred the suit. *See id.* Thus, if anything, this case implies that the doctrine of Massachusetts v. Mellon is alive and well.

Moreover, I believe the majority is wrong in asserting in footnote 16 that South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), "allowed a state to challenge as *parens patriae* an allegedly unconstitutional congressional statute." Quite the contrary, the Court held that Massachusetts v. Mellon barred a *parens patriae* suit by South Carolina. *Id.* at 324, 86 S.Ct. 803. Standing was granted to the state, not as *parens patriae* but in its own right, because the Voting Rights Act of 1965 arguably invaded powers reserved to the states. *See id.* at 323–327, 86 S.Ct. 803.

Finally, our decision in Public Utilities Comm'n of California v. United States, 356 F.2d 236 (9th Cir.), cert. denied, 385 U.S. 816, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966), cites Massachusetts v. Mellon with approval in a situation identical to that presented by this case. There the California counterpart to WUTC challenged an ICC public notice that invited telephone companies to propose tariffs reducing interstate rates. We reasoned that public utility regulation has historically been a legislative function and that rate fixing by a regulatory commission is an essentially legislative act. *Id.,* 356 F.2d at 241. In a footnote we then discussed the *parens patriae* issue:

This raises the question of whether petitioner has standing to maintain this suit in its capacity as a representative of the people of the State of California. It has long been recognized that a state, as *parens patriae*, cannot institute judicial proceedings to protect citizens of the United States from the operation of federal statutes because it is the United States, not the state, to whom citizens of the United States must look as *parens patriae* for protection of whatever rights they might have under federal legislation. Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 61 L.Ed. 1078 (1923).

*Id.* 356 F.2d at 241 n.1 (dictum).

I must also specifically dissociate myself from footnote 17 of the majority opinion, which states that National Association of Regulatory Utility Commissioners (NARUC) has standing in its own right. As with the *parens patriae* discussion, this ground for standing is not needed to decide this case. True, the majority has admitted it to be dicta and placed it in a footnote. Nevertheless, the argument should not go unchallenged.

The majority asserts that NARUC has standing because "Congress has accorded NARUC official status as the representative of state regulatory agencies in dealing with the basic problem underlying these petitions for review." I believe this to be incorrect. Congress has created a Federal-State Joint Board to consider the problems of allocating common carrier property and expenses between interstate and intrastate operations (which is one basis for determining telephone rates). 47 U.S.C. § 410(c). Each time the Federal Communications Commission has a proceeding which concerns the separation problem, it creates a Joint Board to act as a hearing examiner. The board then forwards its recommended decision to the full FCC. The board is composed of three FCC members and four state commissioners "nominated by the national organization of

State commissions," which is NARUC. The state members may participate in the subsequent FCC deliberations, but they do not have a vote. *Id.*

Thus it is inaccurate to say that NARUC has "official status as the representative of state regulatory agencies," at least with respect to the functions of the Joint Board. First, NARUC only nominates the state members—the commission still has the responsibility to select them. The FCC's dominant role in the selection process is illustrated by the parallel provisions of subsection (a) giving the commission discretion to reject any nominee. 47 U.S.C. § 410(a). Second, only the state agency members actually appointed to the Joint Board serve as representatives of state commissions. They, not NARUC, sit on the board as hearing examiners; they, not NARUC, participate in the subsequent FCC deliberations.

NARUC's role is, therefore, rather limited. The organization itself cannot be injured by the FCC's action in the present matter: Its' right to nominate will remain unimpaired. Certainly NARUC has an interest in the matter but only as an interest group like the Sierra Club. It may indeed have standing to challenge FCC decisions but only by asserting injury in fact to its members. Sierra Club v. Morton, 405 U.S. 727, 734–735, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Finally, I do not believe the reliance upon and quotations from National Automatic Laundry and Cleaning Council v. Schultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 694 (1971), in the footnote are persuasive. That case was decided prior to Sierra Club v. Morton and, in my judgment, is inconsistent with the latter's requirement of injury in fact to organization members. *See* 405 U.S. at 738–740, 92 S.Ct. 1361.