Robert ABRAMS, Attorney General of the State of New York, and James P. Corcoran, Superintendent of Insurance of the State of New York, Plaintiffs,

v.

Margaret M. HECKLER, Secretary of the United States Department of Health and Human Services, and Carolyne K. Davis, Administrator of Health Care Financing Administration, Defendants.

No. 83 Civ. 4147 (RLC).

United States District Court,
S.D. New York.

March 14, 1984.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for plaintiff pro se and for plaintiff James P. Corcoran; Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Frederick K. Mehlman, Paul M. Glickman, Daniel D. Kaplan, Asst. Attys. Gen., of counsel.

William D. Gunter, Ins. Com'r and Treasurer of State of Fla., Tallahassee, Fla., amicus curiae; Donald A. Dowdell, Gen. Counsel of State of Fla., Dept. of Ins., Susan R. Renard, Rhoda S. Kibler, Dept. of Ins., State of Fla., Tallahassee, Fla., of counsel.

Rudolph W. Giuliani, U.S. Atty., New York City, S.D.N.Y., for the United States; Frederick Lawrence, Asst. U.S. Atty., New York City, of counsel.

**ROBERT L. CARTER, District Judge.**

Plaintiffs, the Attorney General and Superintendent of Insurance of New York, seek a declaration that a final rule of the United States Department of Health and Human Services, 42 C.F.R. § 405.323 (48 Fed.Reg. 14,810), is unlawful, and an injunction barring its enforcement. They allege that the rule is not authorized by § 953 of the Omnibus Budget Reconciliation Act of 1980, 42 U.S.C. § 1395y(b)(1), the statute pursuant to which the rule was enacted. Defendants have moved to dismiss the complaint on the grounds that plaintiffs lack standing and the Court lacks jurisdiction over the subject matter. Both sides have also moved for summary judgment on the merits.[1]

**I**

New York State's no-fault automobile insurance law provides that no-fault benefits are to be reduced by any amount recoverable under Medicare. N.Y.Ins.Law § 671(2)(b)[2] ("Medicare-offset law"). All New York no-fault policies must contain a clause excluding coverage for services payable by Medicare. N.Y.Ins.Law § 672(4);

---

1. William D. Gunter, the Insurance Commissioner and Treasurer of Florida, has moved for leave to file a brief as *amicus curiae*. That motion is granted.

2. N.Y.Ins.Law § 671(2) states in part:
 " 'First party benefits' means payments to reimburse a person for basic economic loss on account of personal injury arising out of the use or operation of a motor vehicle, less;

 "(b) amounts recovered or recoverable on account of such injury under state or federal laws providing ... medicare benefits (other than lifetime reserve days and provided further that the medicare benefits utilized herein do not result in a reduction of such person's medicare benefits for a subsequent illness or injury). ..."

11 NYCRR § 65.12. As a result of this provision making Medicare the primary payor and no-fault insurers only residually liable, no-fault policies sold to Medicare-eligible insureds are 40% less expensive than the policies sold to those ineligible for Medicare. The average savings is $30 per car and in the aggregate, New York's elderly and disabled auto owners save $18 million annually on car insurance.

Section 953 of the Omnibus Budget Reconciliation Act of 1980 amended the Medicare Act to provide that Medicare payments "may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made (as determined in accordance with regulations) ... under an automobile or liability insurance policy ... or under no fault insurance." 42 U.S.C. § 1395y(b)(1). On April 5, 1983, the Secretary of Health and Human Services issued a final rule designed to implement this statute. The rule provides that Medicare payments will no longer be made for services covered by any auto insurance policy (including no-fault), even if the policy itself and/or state law states that benefits under the policy are secondary to Medicare. 42 C.F.R. § 405.323.[3]

This regulation, in essence, reverses the order of payment when a Medicare beneficiary covered by a New York no-fault policy requires medical or hospital services as the result of a car accident. Prior to the promulgation of the rule, no insurance benefits would have been paid until all recoverable Medicare benefits were exhausted. The rule, however, prohibits the payment of Medicare benefits prior to the exhaustion of recovery under the insurance policy. Since no-fault insurance can no longer be made secondary to Medicare,[4] the policies

sold to Medicare beneficiaries will no longer be at a discount and New York's elderly and disabled will lose their $18 million annual savings.

It is plaintiffs' contention that in light of the New York statute expressly prohibiting the payment of no-fault benefits for services covered by Medicare, the payment of no-fault benefits for such services could not "reasonably be expected to be made" within the meaning of § 953. It follows, plaintiffs argue, that the Secretary's enactment of the rule was in excess of her statutory authority. Defendants counter that the rule is a reasonable exercise of the Secretary's authority under § 953 to issue regulations for determining when payment can "reasonably be expected to be made." Underlying this dispute is a disagreement over the Congressional purpose behind § 953. Plaintiffs believe that Congress sought only to prevent individuals from recovering twice for the same loss, once under Medicare and once under an insurance policy. Such duplicative recoveries were already impossible under the New York statute, as all no-fault policies were required to exclude coverage for services covered by Medicare. Defendants maintain that Congress intended not merely to stop double recoveries, but to reduce federal expenditures by guaranteeing that auto insurers would be primarily liable, and Medicare only residually liable for the cost of services covered by automobile insurance.

Before addressing the merits of this controversy, the Court must first determine whether it has jurisdiction over the action and whether plaintiffs have standing to maintain it.

## II

 Plaintiffs assert that the Court has jurisdiction under the general federal ques-

---

**3.** 42 C.F.R. § 405.323 (48 Fed.Reg. 14,810) states in part:

"Except as specified in paragraph (c) of this section payment may not be made for services covered under an automobile medical or no-fault insurance policy or plan even though State law or the insurance policy or plan states that its benefits are secondary to Medicare's or otherwise excludes or limits it pay-

ments if the injured party is also entitled to Medicare benefits."

**4.** It would perhaps be more precise to say not that states or private insurers have lost the authority to make insurance benefits secondary to the exhaustion of recoverable Medicare benefits, but that the rule reduces the amount recoverable prior to the exhaustion of insurance benefits to zero.

tion and mandamus statutes. 28 U.S.C. §§ 1331 and 1361. In light of the Court's conclusion that § 1331 does provide jurisdiction over the case, it is unnecessary to consider plaintiffs' alternative jurisdictional theory.

42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, states in relevant part: "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this chapter." This unequivocal language would, at first, seem to eliminate § 1331 as a possible basis of jurisdiction, but an extensive body of case law has interpreted § 405(h) as being less absolute in its jurisdictional prohibition than it would appear.

The cases are not all in accord, but two general principles are well established. First, there can be no doubt that plaintiffs would be unable to bring this suit under § 1331 if the Medicare Act contained a jurisdictional grant of its own which would allow plaintiffs to obtain judicial review of the Secretary's action. *See Weinberger v. Salfi,* 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975); *National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932, 937–38 (D.C.Cir. 1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983). The parties agree, however, that the judicial review provisions of the Medicare Act do not apply to this case. Second, if plaintiffs claims were constitutionally based, the cases agree that some forum would be available for judicial review, *Colonial Penn Insurance Co. v. Heckler,* 721 F.2d 431, 436–37 (3d Cir.1983); *National Association of Home Health Agencies,* 690 F.2d at 939,[5] but plaintiffs do not allege a violation of their constitutional rights. Greater discord is evident among the cases considering the question presented here, whether § 405(h) bars § 1331 jurisdiction over a non-constitutional challenge when no alternative pro-

cedure exists for securing judicial review. *See National Association of Home Health Agencies,* 690 F.2d at 940.

A number of cases have reasoned persuasively that § 405(h) does not bar federal question jurisdiction where, as here, the plaintiff does not seek Medicare benefits or a money judgment based on a claim for reimbursement for services rendered, but rather, review of agency action unrelated to such disputes. *Colonial Penn,* 721 F.2d at 436–39; *Starnes v. Schweiker,* 715 F.2d 134, 139–41 (4th Cir.1983); *National Association of Home Health Agencies,* 690 F.2d at 939–42; *United States v. Aquavella,* 615 F.2d 12, 17–21 (2d Cir.1979). Section 405(h) was originally passed to insure that the many thousands of social security claimants did not bypass the regulatory scheme established to review their claims. The incorporation of § 405(h) into the Medicare Act serves an analogous purpose. For example, it keeps the Courts out of "the complex interplay between physician and hospital in ascertaining the appropriate medical charges for technical services...." *St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283 (8th Cir.1976), *cert. denied,* 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976). These concerns are not implicated in a suit such as this, nor is there any likelihood of "a flood of small claims inundating the courts with matters capable of being fairly resolved in administrative proceedings." *Colonial Penn,* 721 F.2d at 439. Moreover, Congressional intent to preclude jurisdiction will not be presumed absent clear and convincing evidence. *Johnson v. Robison,* 415 U.S. 361, 373, 94 S.Ct. 1160, 1168, 39 L.Ed.2d 389 (1974). The legislative history of § 405(h) shows that Congress intended to steer social security claimants into the scheme of administrative and judicial review prescribed by the Act, not that it sought to foreclose federal question jurisdiction when no other statutory review mechanism was

---

**5.** Some courts have refused to take jurisdiction over constitutional claims but with the express understanding that the claims could be heard by the Court of Claims. *E.g., Drennan v. Harris,*

606 F.2d 846, 850 (9th Cir.1979); *Dr. John T. MacDonald Foundation, Inc. v. Califano,* 571 F.2d 328, 332 (5th Cir.1978), *cert. denied,* 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978).

provided. *Chelsea Community Hospital v. Michigan Blue Cross,* 630 F.2d 1131, 1135 (6th Cir.1980).

With these considerations in mind, the Court holds that it has subject matter jurisdiction over this action under 28 U.S.C. § 1331. The Court finds additional support for this conclusion in the Third Circuit's recent ruling that federal question jurisdiction exists over an insurance company's challenge to the retroactivity of the Health and Human Services regulation at issue here. *Colonial Penn,* 721 F.2d at 438–49.

### III

Plaintiffs, as representatives of the State of New York, claim standing to sue in a *parens patriae* capacity on behalf of the citizens of the State. Before assessing the propriety of *parens patriae* standing on the facts of this case, the Court must decide whether it is ever permissible for a state, as *parens patriae,* to sue an agency of the federal government. Relying principally on *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), defendants maintain that it is not. In *Mellon,* the Supreme Court wrote:

> It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

262 U.S. at 485–86, 43 S.Ct. at 600 (citations omitted). Citing *Mellon,* the Court recently stated in dicta that "a state does not have standing as *parens patriae* to bring actions against the federal government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 3270 n. 16, 73 L.Ed.2d 995 (1982).

In *Mellon,* Massachusetts sought to challenge the constitutionality of a federal statute, or, as the Court put it, "to protect the citizens of the United States from the operation of the statutes thereof." 262 U.S. at 485, 43 S.Ct. at 600. Here, plaintiffs do not challenge any federal statute. Rather, they rely on § 953 of the Omnibus Budget Reconciliation Act of 1980, and seek to enjoin an administrative agency from violating that statute. In *Washington Utilities & Transportation Commission v. Federal Communications Commission,* 513 F.2d 1142 (9th Cir.1975), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), the Ninth Circuit held this distinction to be crucial and ruled that *Mellon* does not bar a *parens patriae* action against a federal agency. The Court concluded that a suit to "vindicate the Congressional will" by preventing an administrative agency from violating a federal statute, unlike a challenge to the constitutionality of the underlying statute, does not implicate the federalism concerns behind the *Mellon* decision. 513 F.2d at 1153.

In *Alabama v. Tennessee Valley Authority,* 467 F.Supp. 791, 793–94 (N.D.Ala. 1979), *rev'd on other grounds,* 636 F.2d 1061 (5th Cir.1981), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981), the Court reasoned similarly, finding *Mellon* inapplicable to a lawsuit alleging that the TVA had violated the TVA Act. Recently, in *City of New York v. Heckler,* 578 F.Supp. 1109 at 1123–25 (E.D.N.Y. 1984), Judge Weinstein upheld New York State's *parens patriae* standing to sue over the Secretary's failure to adhere to her own regulations. *See also Carey v. Klutznick,* 637 F.2d 834 (2d Cir.1980) (upholding New York's *parens patriae* standing to sue Census Bureau without discussing *Mellon* ); *Pennsylvania v. Kleppe,* 533 F.2d 668, 682 (D.C.Cir.1976) (Lumbard, J., dissenting) (challenge to constitutionality of statute "clearly and obviously a fundamental threat to the federal sovereign pow-

er," while challenge to administrative enforcement of statute "seeks only to vindicate the will of the people as it has been expressed by their duly elected representatives in the national legislature."), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976); Comment, *Federal Jurisdiction: State Parens Patriae Standing in Suits Against Federal Agencies,* 61 Minn. L.Rev. 691 (1977): Comment, *State Standing to Challenge Federal Administrative Action: A Re-examination of the Parens Patriae Doctrine,* 125 U.Pa.L.Rev. 1069 (1977).

*Mellon* is also distinguishable because New York does not seek, as Massachusetts did, to invoke the Supreme Court's original jurisdiction. The Court's concern for its own caseload counsels stricter scrutiny of cases invoking original Supreme Court jurisdiction than those brought in the district courts. In *Alfred A. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 603 n. 12, 102 S.Ct. 3260, 3267 n. 12, 73 L.Ed.2d 995, the Supreme Court noted that whether a *parens patriae* case could be brought originally in the Supreme Court might well turn on considerations that would not apply if the case were brought in the district court. *See also id.* 102 S.Ct. at 3271 (Brennan, J., concurring).

For these reasons, the Court finds that *Massachusetts v. Mellon* is not a bar to *parens patriae* standing in this case. Although some cases are to the contrary, *e.g. Pennsylvania v. Kleppe,* 533 F.2d 668 (D.C.Cir.1976), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976); *Illinois v. Landrieu,* 500 F.Supp. 826 (N.D.Ill. 1980), the Court declines to apply *Mellon* to a suit brought to enforce a federal statute and to enjoin agency action allegedly in contravention of that statute.

■ In order to maintain a suit in a *parens patriae* capacity, a state must articulate a "quasi-sovereign" interest in the litigation distinct from that of any private party. *Alfred L. Snapp,* 458 U.S. at 607, 102 S.Ct. at 3269; *Abrams v. 11 Cornwell Co.,* 695 F.2d 34, 38–39 (2d Cir.1982), *vacated on other grounds,* 718 F.2d 22 (2d Cir.

1983). The Supreme Court has left the determination of what interests qualify as "quasi-sovereign" for case by case development, but it noted that a state definitely has such an interest in the economic well-being of its residents in general. *Alfred L. Snapp,* 458 U.S. at 607, 102 S.Ct. at 3269. While there is no clear test with respect to how substantial a portion of a state's citizens need be affected before this interest is implicated, the Court has no difficulty in concluding that it is implicated here. The Secretary's final rule will deprive 600,000 Medicare-eligible New York car owners of $18 million annually. Moreover, passengers and pedestrians, as well as car owners, are covered by New York's no-fault law. Formerly, if he or she were a Medicare beneficiary, any such passenger or pedestrian injured in a car accident would be compensated by the no-fault insurer only to the extent his or her medical bills were not covered by Medicare. Since the insurer will become the primary payor under the rule, the no-fault premiums of all New York car owners, not just the Medicare recipients among them, will likely rise. There are approximately 6,000,000 car owners in New York.

■ Defendants argue that New York can have no "quasi-sovereign" interest in this dispute because an injunction against the enforcement of the Secretary's regulation may run counter to the interests of some New Yorkers. For example, the reduction in Medicare's liability to auto accident victims effected by the rule may inure to the benefit of those New York citizens who do not own cars but who do pay federal taxes. However this may be, the mere fact that some of the state's citizens may oppose the position taken by the state's officials does not mean that the state lacks a "quasi-sovereign" interest. The Supreme Court has stated that "[o]ne helpful indicia in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue as *parens patriae* is whether the injury is one that the state, if it could, would likely attempt to address through its sovereign law-

making powers." *Alfred L. Snapp*, 458 U.S. at 607, 102 S.Ct. at 3269. Here, New York *actually has* addressed the problem by legislation. It is the impact of the Secretary's regulation on that legislation that gives rise to this lawsuit. The state's elected lawmakers have weighed the competing private interests and, by statute, expressed New York's sovereign interest in reducing the cost of no-fault insurance for the elderly and disabled. The Court can see no reason why in this case it should "superimpose its judgment for that of [New York] with respect to the substantiality or legitimacy of [New York's] assertion of sovereign interest." *Id.* 102 S.Ct. at 3272 (Brennan, J., concurring). Accordingly, the Court finds that plaintiffs have standing to litigate this case as *parens patriae* on behalf of the citizens of New York.

## IV

■ Plaintiffs also claim that they have standing to sue on their own behalf. To evaluate this claim, the Court must determine whether plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure the concrete adversariness which sharpens the presentation of the issues upon which the court so largely depends..." *Duke Power Co. v. Carolina Environmental Study Group Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2360, 57 L.Ed.2d 595 (1978) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). As a constitutional minimum, this "personal stake" must consist of a showing that (1) plaintiffs have suffered some actual or threatened injury, *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); (2) the injury "fairly can be traced to the challenged action," *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); and (3) "the exercise of the Court's remedial powers would redress the claimed injuries," *Duke Power*, 438 U.S. at 74, 98 S.Ct. at 2631. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ Plaintiffs allege that they have been injured because the regulation at issue here interferes with their ability to discharge their obligation to protect the interests of New York's elderly and disabled car owners. Through its Medicare-offset law, New York has expressed its policy of reducing the no-fault premiums of its Medicare-eligible citizens. Plaintiff Abrams, who as Attorney General is responsible for enforcing all state laws, and plaintiff Corcoran, who as Superintendent of Insurance is responsible for enforcing all state laws governing the insurance industry, are the state officials charged with implementing that policy. Since it is undisputed that the Secretary's regulation will eliminate the $18 million annual savings to New York's elderly and disabled car owners which it was the central purpose of the Medicare-offset law to create, plaintiffs conclude that the regulation frustrates their efforts to enforce the laws and implement the policies of the State of New York, as they are duty-bound to do. As a result, they allege, they have been injured in their official capacities.

A number of cases support plaintiffs' contention. In *Washington Utilities & Transportation Commission v. Federal Communications Commission*, 513 F.2d 1142, 1149 (9th Cir.1975), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), the Ninth Circuit held that the state commission was "injured" by a final FCC order that would result in higher telephone rates for the residents of the state of Washington. The Court reasoned that the Washington commission was obligated to protect the interests of state telephone users and that an FCC order that would raise rates injured the commission by interfering with its ability to meet this obligation. The Court in *Florida v. Weinberger*, 492 F.2d 488, 494 (5th Cir.1974), held that the state of Florida was "injured" by a federal medicaid regulation which provided that nursing home administrators could not comprise a majority of the state boards that license such administrators. When

the rule was enacted, Florida law required a majority of administrators on such boards. The Court found that Florida had a "clear interest ... in being spared the reconstitution of its statutory program ..." *Id.* The Court also concluded that the state licensing board's concern with the statute governing its composition gave the board standing to contest the regulation. *See also Pennsylvania v. United States Department of Agriculture,* 469 F.2d 1387 (3rd Cir.1972) (state has standing due to its interest in upholding its own statutory scheme of meat inspection).

Here, as in *Washington Utilities,* the challenged regulation will impede the plaintiffs' ability to protect the interests of those they are charged by statute with protecting. As in *Florida v. Weinberger,* the Secretary's rule is directed to an end wholly opposite to that of a state statute which plaintiffs are required to enforce. In the Court's view, this interference with plaintiffs' execution of their official tasks subjects plaintiffs to a "distinct and palpable injury." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). It is readily apparent that plaintiffs' injury can fairly be traced to the Secretary's regulation and that the requested injunction prohibiting enforcement of the regulation would redress that injury. Therefore, the Court finds that plaintiffs have met the constitutional standards for standing to sue.

None of the prudential concerns which the Supreme Court has indicated may deprive a party of standing even if he meets the Article III minima are relevant here. Plaintiffs assert their own rights, not those of third parties, and the injury they suffer is concrete and specific, not merely "a generalized grievance shared by a large number of citizens in a substantially equal measure." *Duke Power,* 438 U.S. at 80, 98 S.Ct. at 2632. Defendants argue that an additional prudential limit on standing requires plaintiffs to show that their interest in this litigation is "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184. This Court has previously held that the "zone of interests" test is inapplicable except in taxpayer standing cases, *Abortion Rights Mobilization, Inc. v. Regan,* 544 F.Supp. 471, 484 n. 11 (S.D.N.Y.1982) (Carter, J.), but several later cases have applied the test outside that context. *E.g. Colonial Penn Insurance Co. v. Heckler,* 721 F.2d 431, 434 (3rd Cir.1983); *City of New York v. Heckler,* at 1121 (E.D.N.Y. Jan. 11, 1984). In *B.K. Instrument, Inc. v. United States,* 715 F.2d 713 (2d Cir.1983), the Second Circuit questioned, without deciding, whether the "zone of interests" test was still "a vital part of the Supreme Court's jurisprudence with respect to standing," but in *New York v. Heckler,* 719 F.2d 1191, 1195 (2d Cir. 1983), the Court applied the test. In light of these recent precedents, the Court has applied the test here and concluded that plaintiffs have met it.

The "zone of interests" test is a generous one. *Colonial Penn,* 721 F.2d at 435. "[A] court should be hesitant to deny a party standing on this basis alone without clear evidence of a legislative intent to restrict access to judicial review." *City of New York v. Heckler,* at 1122. Absent such clear intent, "a court should demand no more than a sensible relation between some subject of the statute and the plaintiff's interest in the outcome of the litigation." *Id.* (quoting *National Collegiate Athletic Association v. Califano,* 622 F.2d 1382, 1386 (10th Cir.1980)).

Plaintiffs' interest in this litigation is in removing an impediment to their effective enforcement of the Medicare-offset provision of New York's no-fault law. Defendants maintain that this interest is unrelated to the purposes which underlie the Medicare Act. The Act is designed to protect the interests of Medicare beneficiaries and providers of services and only these groups, defendants argue, fall within its "zone of interests". *See National Union of Hospital and Health Care Employees v. Carey,* 557 F.2d 278, 280–81 (2d Cir.

1977); *Doe v. Heckler,* 568 F.Supp. 681, 683 (D.Md.1983). The Court, however, must examine not only the Medicare Act, *in toto,* but also the specific provisions of § 953 of the Omnibus Budget Reconciliation Act of 1980, 42 U.S.C. § 1395y(b)(1). That statute, no matter how interpreted, is on its face concerned with the relationship between Medicare benefits and state no-fault insurance programs. *See Colonial Penn,* 721 F.2d at 435 (auto insurance company within zone of interests of § 953). Moreover, it is on the basis of this statute that the Secretary claims authority to make Medicare benefits secondary to no fault insurance despite state statutes to the contrary. It is difficult to see how § 953 could authorize a regulation with so drastic an impact on state insurance law and yet have no "sensible relation" to plaintiffs' interest in the integrity of that state law. Finally, the Secretary has argued that § 953 "relates to the business of insurance" within the meaning of the McCarran-Ferguson Act, the federal law which limits federal interference with state regulation of the insurance industry, 15 U.S.C. § 1012.[6] 48 Fed.Reg. 14,804 (See Part V, *infra*). If the statute relates to the insurance business, it clearly follows that plaintiffs' interest in enforcing a state insurance law allegedly at odds with the statute (as construed by the Secretary), is *arguably* within the "zone of interests" regulated by that statute.

## V

Having concluded that the Court has subject matter jurisdiction and that plaintiffs have standing to sue, the Court must now determine whether the Secretary's final rule was authorized by § 953. While there is no question that the courts, and not the administrative agencies, are the final authority in matters of statutory construction, *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 272, 88 S.Ct. 929, 935,

19 L.Ed.2d 1090 (1968), the Court need not find that the Secretary's construction is the only reasonable one in order to uphold her regulation. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Considerable deference is due to the construction placed upon a statute by the agency charged with implementing its provisions. *Id.* This is especially so where the statute expressly delegates to the agency the responsibility for defining the precise meaning behind a general statutory provision. *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). Here, the statute instructs the Secretary to issue regulations for determining when payment "can reasonably be expected to be made" under a no-fault insurance policy. The proper construction of the quoted statutory language is the key issue in the parties' dispute over the meaning of § 953. Under these circumstances, the Court's review is limited to determining whether the Secretary's regulation was promulgated in excess of her authority and whether it is arbitrary and capricious. *Heckler v. Campbell,* —— U.S. ——, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66 (1983); *Batterton v. Francis,* 432 U.S. at 425–26, 97 S.Ct. at 2405–06.

Plaintiffs insist that the Secretary's determination of when payment "can reasonably be expected to be made" under an insurance policy must be based upon the terms of the policy precisely as written, including any provision of the policy expressly designed to withhold payment in favor of Medicare. All New York no-fault policies, by law, have such a provision. The Secretary maintains that the delegation of authority to promulgate rules for determining when payment can be expected should be interpreted as a more flexible grant of authority to set the substantive standards for assessing the probability of payment which best comport with the Congressional purpose behind § 953.

---

**6.** 15 U.S.C. § 1012 states in part:
"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regu-

lating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance...."

Plaintiffs' assertion to the contrary notwithstanding, the statutory language is not so clear and unambiguous as to be susceptible of no interpretation but their own. It is certainly plausible to read the statute as plaintiffs do, interpreting a "reasonable" expectation of payment as meaning reasonable with respect to the express terms of the policy. But on the other hand, in light of the fact that the statute is concerned with the relationship between Medicare and auto insurance, it is equally plausible to read "reasonable" as meaning reasonable without regard to the insurance policy's own terms governing its relationship to Medicare.

As noted earlier in this opinion, the parties' dispute over the statutory language reflects their disagreement over the purpose behind § 953. Plaintiffs argue that Congress sought only to eliminate double recoveries and not to affect the priority of payment as between Medicare and automobile insurance. Defendants maintain that the statute was designed to guarantee that auto insurers would be primarily liable for the services covered by their policies. In the Court's view, the legislative history substantiates the Secretary's reading of the statute. The Budget Committee Report that accompanied the House version of the statute stated:

Under Title VIII, medicare will have residual rather than primary liability for the payment of services required by a beneficiary as a result of an injury or illness sustained in an auto accident where payment for the provision of such services can also be made under an automobile insurance policy.

... Under present law, medicare is the primary payor ... for hospital and medical services received by beneficiaries. This is true even in cases in which a beneficiary's need for services is related to an injury or illness sustained in an auto accident and the services could have been paid for by a private insurance carrier under the terms of an automobile insurance policy. As a result, medicare has served to relieve private insurers of obligations to pay the costs of medical care in cases where there would otherwise be liability under the private insurance contract.

H.R.Rep. No. 96–1167, 96th Cong., 2d Sess. 389, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5526, 5752. The report plainly states Congress's intention that auto insurers be primarily liable for the cost of services covered by their policies. Moreover, it is especially clear that double recovery was not the only, if even the primary, problem Congress sought to correct, as the report objected to Medicare "reliev[ing] private insurers of obligations to pay," not to Medicare paying *in addition* to private insurers.

The Secretary's regulation, which makes Medicare only residually liable despite any Medicare-offset clause in a private insurance policy or any state law requiring such a clause, is the only rule which can effectively implement Congressional policy. If the Secretary were required to respect such clauses in determining when payment "can reasonably be expected to be made," Medicare would remain the primary payor for those beneficiaries covered by auto insurance. Although double recoveries would still be prevented even in those states which did not previously prohibit them, the federal government would save little as those who had been double covered would surely drop the privately purchased insurance coverage, not the publicly provided Medicare. Such an election could be made simply by the inclusion of a Medicare-offset clause in any auto insurance contract. The legislative history of the Omnibus Reconciliation Act of 1980, as a whole, demonstrates conclusively that the Act was designed to reduce federal expenditures. *Id.* at 5527–28. Section 953 would wholly fail of this purpose if plaintiffs' construction were adopted.

Plaintiffs point out that the House version of § 953 did not cover no-fault. A Senate amendment, accepted in conference, brought no-fault (and liability insurance) within the scope of the statute. Nothing in the House Conference Report, however, indicates that no-fault policies were to be treated differently under § 953 than were other auto or liability policies. House Con-

ference Rep. No. 96–14, 96th Cong., 2d Sess. 133, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5903, 5924.[7] Nothing on the face of the statute or in the legislative history even suggests that Medicare was to be made the residual payor for all persons covered by fault-based policies, but that no-fault insureds were to be allowed to look to Medicare for their primary recovery.

Finally, plaintiffs argue that as matter statutory construction, the Court cannot interpret § 953 as authorizing a regulation that undermines New York's Medicare-offset statute because there is no clear evidence that Congress intended § 953 to preempt state law. "It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of the intention to do so." *Schwartz v. Texas*, 344 U.S. 199, 202–03, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952); *see also New York State Department of Social Services v. Dublino*, 413 U.S. 405, 413–14, 93 S.Ct. 2507, 2512–13, 37 L.Ed.2d 688 (1973). This is especially true, plaintiffs maintain, where the affected state law concerns the business of insurance. Congress's concern for the integrity of the states' regulatory schemes governing insurance is evident in the McCarran-Ferguson Act.[8]

The Court has no quarrel with this general principle of statutory construction. The simple answer to plaintiffs' argument, however, is that the legislative history of § 953, as the Court reads it, does contain a "clear manifestation of [Congress's] intention" to make Medicare secondary to auto insurance benefits. Since New York law does precisely the opposite, Congress could only have intended to override the state statute. Although Congress did not, in so many words, declare its awareness that in passing § 953 it would supersede state Medicare-offset laws, the Court must infer that Congress intended to do so when such would plainly be the result of effectuating the statute's clearly articulated purpose.

## VI

As the Court has jurisdiction over this action and the plaintiffs have standing to sue, defendants' motion to dismiss the complaint under F.R.Civ.P. 12(b)(1) and (6) is denied. However, the Court finds that the Secretary's final rule was authorized by § 953 of the Omnibus Budget Reconciliation Act of 1980, 42 U.S.C. § 1395y(b)(1), and is consistent with the Congressional purpose behind that statute. The promulgation of the rule was, therefore, neither arbitrary, capricious, nor in excess of statutory authority. Accordingly, defendants' motion for summary judgment dismissing the complaint under F.R.Civ.P. 56 is granted.

IT IS SO ORDERED.

---

**7.** The Report states:

"With respect to no-fault insurance plans, the provision is applicable only to the policies or plans actually held by the individuals involved and not to any hypothetical policies or plans that an individual at one time could have opted, but did not opt, to enroll in." 1980 U.S.Code Cong. & Ad.News at 5924. This comment would seem to address a completely unrelated concern, and though plaintiffs apparently suggest that it indicates Congressional deference to state Medicare-offset provisions, they offer no support for that view. Plaintiffs have noted that certain state no-fault schemes allowed consumers to purchase insurance coverage that duplicated Medicare, but they acknowledge that § 953 prohibits this. They have not pointed to any state which allows the no-fault consumer to opt against Medicare-offset, with

its substantial savings, when double recovery is prohibited. Nor would such an option be rational. Therefore, the Report's statement that § 953 applies only to the policy actually chosen, and not to one which an individual "could have opted, but did not opt, to enroll in", has no bearing on the Medicare-offset issue.

**8.** *See* note 6. Plaintiffs do not appear to argue that the Secretary's construction of § 953 is barred by the McCarran-Ferguson Act. Rather, they contend that "the final rule violates the principal [sic] of federalism embodied in the … Act." Plaintiffs' Memorandum of Law p. 50. In any case, § 953 "specifically relates to the business of insurance" within the meaning of the Act. As noted above, § 953 is explicitly addressed to the relationship between Medicare and automobile insurance, including no-fault.